■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALBERT P. COBENAIS, Appellant. [755 NYS2d 736] —Peters, J. Appeal from a judgment of the County Court of Cortland County (Avery, Jr., J.), rendered May 8, 2001, upon a verdict convicting defendant of the crimes of attempted rape in the first degree, sexual abuse in the first degree, unlawful imprisonment in the second degree and menacing in the third degree.

Defendant was charged in an eight-count indictment with numerous crimes, all arising out of an alleged sexual assault upon an adult female relative. Prior to trial, County Court dismissed the criminal mischief, assault and harassment counts of the indictment and held hearings concerning other relief requested by defendant. Later, although the court denied suppression of defendant's statements and the physical evidence seized, it granted his *Sandoval* motion. A jury convicted defendant of the remaining counts of the indictment—attempted rape in the first degree, sexual abuse in the first degree, unlawful imprisonment in the second degree and menancing in the third degree—and he appeals.

Defendant challenges County Court's suppression ruling, its refusal to conduct a *Ventimiglia* hearing and its admission of portions of a 911 tape. He further asserts that his constitutional right to the effective assistance of counsel was violated by his attorney's failure to request limiting instructions with regard to testimony from the alleged victim that he had, in the past, bragged of killing someone. In his pro se brief, defendant further contends, inter alia, that the verdict was against the weight of the evidence and that he was denied the effective assistance of appellate counsel.

In conducting a weight of the evidence review, we examine the evidence in a neutral light to determine whether a different result would not have been unreasonable. If so, we must " 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (*People v Bleakley*, 69 NY2d 490, 495, quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62) and set the verdict aside if we conclude that the trier of

fact failed to give the evidence the weight it should be accorded. Here, our review reveals that a different result would not have been unreasonable, yet after engaging in a weight analysis and according due deference to the jury's opportunity to view the witnesses, hear their testimony and observe their demeanor (*see People v Bleakley*, *supra* at 495), we are convinced that the evidence presented and the inferences to be drawn therefrom were of sufficient strength to support the jury's verdict.

The victim's husband testified that on May 19, 2000 at about 4:30 P.M., the victim went to her sister's home to get migraine headache medicine. The next time he saw her was approximately one hour later when she ran into their home, collapsed into his arms and told him to dial 911, reporting that defendant tried to rape her. He described her appearance as different than when she left—she did not have her glasses on and there were red marks on her hand. According to a redacted 911 tape admitted into evidence, the husband told the dispatcher, inter alia, that defendant, who drinks alcohol, tried to rape his wife, and he was probably drunk at that time. In the background, the victim can be heard sobbing.

Officer Carl Altman, who initially responded to the 911 call, traveled to the home of the victim and then to defendant's residence. While he and another officer were knocking on defendant's door, defendant's wife arrived home. After Altman explained that he was looking for defendant, she denied having seen him in some time, but invited them in. Therein encountering defendant, Altman engaged in "small talk" while waiting for a more senior law enforcement officer to arrive; neither defendant nor his wife asked either officer to leave. After the arrival of Captain Martin Coolidge, Altman took photographs of certain portions of the residence; again neither defendant nor his wife objected.

Coolidge testified that he traveled to the victim's residence, interviewed and photographed her, and spoke to her husband. He then went to defendant's home, knocked on the door and went inside. At the time, defendant was sitting at the kitchen table and two police officers were standing in the kitchen. When asked how he came to believe he had permission to enter the residence, Coolidge advised that he had knocked on the door and then entered, knowing that two officers were already inside. He was never asked to leave.

After providing defendant with his *Miranda* warnings and the victim's account of the incident, defendant provided Coolidge with his version of the events. He stated that when

the victim arrived at his residence, his wife left to go to the store. He then asked the victim for her underwear so he could hang them on a radio tower as he was in the business of constructing such towers. She refused his request and suddenly got up and ran out the door. He wholly denied having any physical contact with her, yet during the interview, Coolidge noted eyeglasses on a stand in the bedroom. After questioning, defendant explained that they belonged to the victim. Defendant's wife, who had found the earpiece from the eyeglasses on the floor by the stereo in the living room, advised that the glasses in the bedroom were found by her on the living room floor. Coolidge's interview with defendant's wife revealed that she saw the victim running across the yard when she arrived home from the store.

The victim testified, providing the same explanation for her visit to defendant's home and describing how his wife left to purchase the medicine she needed. However, she stated that defendant had been drinking, grabbed her arms, pulled down her pants and fondled her breasts while repeatedly shouting, "you know what I want, just give it up." She further recounted that he "told me if I didn't shut up he was going to kill me." When asked why she thought that he would kill her, the victim related that "he had bragged before this that he had killed somebody." When the telephone rang, she escaped and ran the short distance back to her home where she reported the incident to her husband. She denied ever having given him her underwear or having an intimate relationship with him. The victim suffered contusions, back strain and neck strain as a result of defendant's attack. At first, she only noticed her red wrists, but sought medical care five days later for bruises, pains and shortness of breath. The People proffered medical testimony consistent with the victim's description of the incident and her injuries.

In response to this compelling testimonial and documentary evidence, the defense propounded the testimony of defendant, his wife and two of his relatives. While his wife confirmed that she left to purchase medicine for the victim, she now asserted that, during her short sojourn, she remained in touch with defendant via a two-way radio. Moreover, she now asserted that defendant told her that, after she had left, the victim asked him to fix her eyeglasses, ultimately throwing them at him. Finally, she testified that when she went to the victim's home to provide her with the medicine, she found emergency person-

nel in white suits[1] talking to the victim, and the victim then told her that defendant had tried to rape her. According to the witness, after returning to her own home and confronting defendant, he admitted to having had an intimate relationship with the victim and that he had been providing her with money. Defendant's wife explained that, when the police arrived, she told them that her husband was not there so that he would have time to call a lawyer. This testimony differed from the statement that she had provided to Coolidge on the day of the incident.

Defendant testified, confirming the reason for the victim's presence at his residence and his wife's sojourn, but contended that he had no physical contact with the victim and provided no explanation for her bruises. He asserted that she asked him to fix her glasses, which he refused. He further stated that he stayed in touch with his wife during her sojourn via a two-way radio and that while his wife was gone, he asked the victim for a pair of her underwear to put on a tower, asserting that while she had previously provided him with such garments, this time she refused. The victim then demanded money from him which he refused. They traded threats to reveal their relationship to each other's spouses and, during this interchange, the victim became angry, threw her glasses at him and left. Notably, at the time of his initial interview with police authorities, defendant had not disclosed his relationship with the victim; no additional evidence was propounded to support this assertion.

To be sure, a jury is not required to accept the testimony offered by one party simply because the opposing party has not provided contradictory evidence (*see People v Rose*, 215 AD2d 875, 876, *lv denied* 86 NY2d 801). Here, with starkly contrasting scenarios presented, the jury's assessment of credibility was critical; it could credit or reject any or all of the witnesses' testimony. Viewing the evidence in a neutral light, with appropriate deference accorded to the jury's opportunity to view the witnesses, hear their testimony and observe their demeanor (*see People v Bleakley*, 69 NY2d 490, 495, *supra*), we are convinced that the evidence and the inferences to be drawn therefrom fully support the jury's verdict.

Next addressing defendant's *Ventimiglia* challenge, defendant contends that County Court should have granted a hearing to consider the admissibility of the victim's statement regarding his intention to kill her if she did not stop resisting his attack. Prior to her revealing this information to the jury,

---

1. Rebuttal testimony revealed that the personnel who responded to the 911 call did not wear white suits.

however, defendant objected on the ground that her anticipated answer would violate the spirit of County Court's *Sandoval* ruling. At an ensuing sidebar conference, the People explained that the victim's statement was relevant to a frightened state of mind which went to the element of forcible compulsion that they were required to prove on the attempted rape charge. While evidence of uncharged crimes and offenses is inadmissible if its purpose is to infer that defendant is of a criminal disposition and likely to have committed the crime for which he is on trial, the statement offered by the People was not to show his criminal propensity, but to prove that the victim was an unwilling participant (*see People v Vargas*, 88 NY2d 856, 858; *see also* Penal Law § 130.00 [8]). Her testimony was clearly relevant to a material element of the crime charged and did not constitute proof of an uncharged crime (*compare People v Intelisano*, 188 AD2d 881, 883). Consequently, County Court properly admitted the statement.

As to the suppression challenge where County Court admitted (1) photographs taken by the investigating police officers of the inside of defendant's home, (2) the victim's eyeglasses and earpiece and (3) defendant's statements to such officers, we find no error. The investigating officers were given free and voluntary consent by defendant to speak with him in his home, take photographs and remove the eyeglasses and earpiece which were, in any event, clearly in plain view of Coolidge (*see People v Dobson*, 285 AD2d 737, 738, *lv denied* 97 NY2d 655; *People v Spencer*, 272 AD2d 682, 683, *lv denied* 95 NY2d 858; *People v London*, 124 AD2d 254, 255, *lv denied* 68 NY2d 1001).

Turning to defendant's assertion that he was denied his constitutional right to the effective assistance of both trial and appellate counsel, neither assertion warrants extended discussion. While we agree that defendant's trial counsel should have requested limiting instructions to reduce the potential prejudicial impact of the victim's testimony regarding defendant's statement about killing someone, this failure is insufficient to establish ineffective assistance of counsel since "the evidence, the law, and the circumstances of * * * [the] particular case, viewed in totality and as of the time of the representation, reveal that the attorney[s] provided meaningful representation" (*People v Baldi*, 54 NY2d 137, 147).

Finally, we address defendant's challenge to County Court's admission of portions of the 911 tape recording the call made by the victim's husband shortly after she returned home. While defense counsel objected to its introduction as highly prejudicial, we find the redacted tape to have properly permitted the

jury to consider the victim's excited emotional state as probative of her state of mind—a critical element of the attempted rape charge. As reasoned by the court, the victim's cries and agitated comments heard in the background were relevant to prove the "forcible compulsion" element of the attempted rape charge (*see* Penal Law § 130.00 [8]; § 130.35).[2] As the victim's outbursts were offered only to show her state of mind (*see People v Bruner*, 222 AD2d 738, 739, *lv denied* 88 NY2d 981), we find them to have been properly admitted.

Having reviewed and rejected, as without merit, the additional ascriptions of error asserted by defendant, we affirm.

Mercure, J.P., Mugglin, Lahtinen and Kane, JJ., concur. Ordered that the judgment is affirmed.

2. In its evidentiary ruling, County Court ordered that certain references on the tape to defendant's prior parole status be deleted. It appears from the record that County Court would have preferred to have deleted the entire conversation between the victim's husband and the dispatcher, leaving only the victim's contributions intact. Yet, upon being advised that this redaction was technologically impossible, County Court issued a brief curative instruction and further advised that the tape was being played only to indicate the excited utterance of the victim.