People v Sammeth (2021 NY Slip Op 00212)





People v Sammeth


2021 NY Slip Op 00212


Decided on January 14, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 14, 2021

112346

[*1]The People of the State of New York, Respondent,
v
Travis Sammeth, Appellant.

Calendar Date: December 16, 2020

Before: Garry, P.J., Egan Jr., Mulvey, Aarons and Reynolds Fitzgerald, JJ.


Ostrer & Associates, PC, Chester (Benjamin Ostrer of counsel) and Hasapidis Law Offices, South Salem (Annette G. Hasapidis of counsel), for appellant.
David J. Clegg, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.



Garry, P.J.
Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered November 25, 2019, upon a verdict convicting defendant of the crime of attempted rape in the second degree.
In September 2018, law enforcement officers assigned to the FBI's Child Exploitation and Human Trafficking Task Force conducted a sting operation in which they used adult websites to identify and arrest persons seeking to have sexual contact with minors. In defendant's case, a State Police investigator (hereinafter the investigator) posed online as a 38-year-old man offering sexual contact with his fictitious 14-year-old stepdaughter. Defendant communicated with the investigator through an adult website and, by instant message, agreed to meet the investigator and stepdaughter and traveled to the agreed-upon location for the purpose of having sexual contact with the stepdaughter. Upon defendant's arrival, he spoke briefly with another member of the Task Force who was posing as the stepfather (hereinafter the Task Force officer). He was then arrested.
Defendant was charged by indictment with one count of attempted rape in the second degree. Following a suppression hearing, he moved for reinspection of the grand jury minutes and dismissal of the indictment, alleging that the integrity of the proceedings was impaired by irregularities in the testimony. County Court granted the motion for reinspection and denied the motion for dismissal. Following a jury trial, defendant was convicted as charged. Thereafter, he moved to set aside the verdict and renewed his application for dismissal of the indictment. The court denied these motions and sentenced defendant to a probationary term of 10 years, with the first 90 days to be served in the Ulster County jail. Defendant appeals.
We reject defendant's contention that the verdict was against the weight of the evidence in that the People failed to prove that he "came dangerously close to engaging in [the crime of rape in the second degree]" (People v Butkiewicz, 175 AD3d 792, 793 [2019] [internal quotation marks and citation omitted], lv denied 34 NY3d 1076 [2019]; see Penal Law §§ 110.00, 130.30 [1]; compare People v Hiedeman, ___ AD3d ___, ___, 2020 NY Slip Op 07954, *2-4 [2020]). The People's witnesses were the investigator, the Task Force officer and a detective in the Ulster County Sheriff's Department (hereinafter the detective) who interviewed defendant after his arrest. The investigator testified that he and other members of the Task Force conducted an operation over the course of three days in September 2018 in which they set up profiles on adult websites for the purpose of identifying and arresting persons seeking to have sexual contact with minors; the operation resulted in eight arrests. In defendant's case, the investigator created a profile on an adult website in which he claimed to be a 38-year-old man seeking an "open-minded" male to join him and an 18-year-old woman "for some taboo fun." [*2]Defendant responded to the posting through the website's messaging system. The investigator replied that his "situation [was] pretty taboo" and asked defendant to leave the website and discuss the matter on an instant messaging application known as Kik. The investigator testified that he made this request, and described the female as an adult in his profile, because the website did not permit discussions of underage sex.
Copies of these website communications and defendant's subsequent Kik exchange with the investigator were submitted into evidence. These show that, using Kik, the investigator told defendant that he was seeking a male partner for himself and his 14-year-old stepdaughter. Defendant asked for pictures of the stepdaughter, and the investigator responded by sending a photo of an undercover female officer, posing as the stepdaughter. Defendant requested a better picture; the investigator responded that he was uncomfortable sending a photo of the stepdaughter's face because of her youth, but that he could send one depicting her body. He sent two additional photos of the undercover officer in which her face was not visible, and defendant responded, "Cover her face. I might be interested."
Defendant then asked what the investigator and the stepdaughter were doing that night and where they could meet. The investigator suggested that they meet at a recreational vehicle (hereinafter the RV) in a store parking lot about 30 minutes from defendant's location, where he said they were camping; in fact, the RV had been set up by the Task Force for use as a meeting place with persons involved in the sting operation. Defendant agreed and told the investigator that he was on the way. As for sexual activity, defendant asked the investigator whether he wanted to "tag team." The investigator responded that he did, but advised defendant that anal intercourse would not be permitted. The investigator further stated that he was "straight" and did not want to have intentional contact with defendant, and defendant replied, "Same here." The investigator asked defendant to wear a condom because the stepdaughter was not using birth control. Defendant agreed and asked the investigator to get one for him.
The Task Force officer testified that he met defendant outside the RV upon his arrival, took the role of the stepfather, and engaged defendant in conversation. A video recording of this encounter was submitted at trial. The Task Force officer asked if defendant was a police officer, warning that "this is risky s***," and defendant responded that he was not. The Task Force officer told defendant that the stepdaughter was 14 years old and "just kinda getting into the swing of things," and that he did not want her to be hurt or be frightened. He cautioned defendant to be gentle, to "go slow," and to "back off a little bit" if needed. Defendant agreed with each of these warnings with such remarks as "Yeah," "[A]ll right," and "We'll see. We'll [*3]see how it goes. If it's not feeling right, we'll just go." The Task Force officer told defendant that he wanted to join defendant and the stepdaughter in the RV; defendant agreed, and the Task Force officer told defendant to "get something going and then the three of us will have a good time." Defendant responded, "We'll see what happens." The Task Force officer said, "If you want to lay her, that's good. She might do some other things, too." Defendant said, "All right." Upon a prearranged signal, defendant was then arrested.
The detective who interviewed defendant after his arrest testified about the interview, and a recording was played for the jury. Defendant admitted that the investigator had told him that the stepdaughter was 14 years old, saying, "And then I agreed, and then I still came up here." When pressed to describe the activities he expected to engage in with the stepdaughter, defendant was initially reticent, saying, "I mean, you guys know what I'm saying, I just don't want to say it." Later, however, he acknowledged that the purported stepfather had agreed to provide defendant with a condom and said that he was "complicit," or "just going along" with what the stepfather wanted to do, which was "I guess . . . sexual intercourse." When asked who he believed would be "hooking up during the encounter," defendant responded, "[The stepfather] and [the stepdaughter] and then me and her."
Defendant argues that the People failed to prove attempt, as the proof does not show that he ever expressly stated an intention to have intercourse with the stepdaughter or to do anything more than talk to her. However, the jury could have found that defendant's intentions were implied by the proof, including, among other things, the testimony that defendant asked the investigator whether he wanted to "tag team" and to get him a condom, as well as defendant's admissions to the detective. As defendant argues, most of the specific suggestions for sexual activity were initiated by the officers rather than defendant; nevertheless, the record shows that he consistently expressed agreement with their proposals and never rejected or disagreed with them.
Defendant further argues that the officers' credibility was damaged by certain inaccuracies in their grand jury testimony that conflicted with their trial testimony. Specifically, the investigator acknowledged that, when he printed out his Kik exchange with defendant immediately after his arrest, he inadvertently failed to include the first two remarks in the exchange, and did not discover the error until after he erroneously testified before the grand jury that he was describing the complete exchange. The detective incorrectly testified before the grand jury that defendant had said that he had spoken on the telephone with the investigator, when in fact their exchange was confined to online messaging. Finally, the Task Force officer made several statements before the grand jury that were inaccurate [*4]or that defendant contends could have misled the grand jury. For example, the Task Force officer told the grand jury that he and defendant "discussed what type of sex acts [defendant] wanted to perform." Defendant asserts that this could have misled the grand jury into believing that defendant had expressly stated his intent to have sexual intercourse, when in fact he had merely agreed with suggestions made by the Task Force officer. The claimed inaccuracies were thoroughly explored in cross-examination, and the officers stated that they were inadvertent. Moreover, the officers' trial testimony was corroborated by the printouts and recordings that reproduced their exchanges with defendant.
The effect of the inaccuracies on the officers' credibility was an issue for the jury to resolve (see generally People v Dickinson, 182 AD3d 783, 788 [2020], lv denied 35 NY3d 1065 [2020]). Had the jury accepted defendant's argument that the People failed to prove intent, a different verdict would not have been unreasonable (see People v Blair, 184 AD3d 946, 949 [2020], lv denied 35 NY3d 1042 [2020]; see generally People v Bleakley, 69 NY2d 490, 495 [1987]). Nevertheless, "[v]iewing the evidence in a neutral light, with appropriate deference accorded to the jury's opportunity to view the witnesses, hear their testimony and observe their demeanor, we are convinced that the evidence and the inferences to be drawn therefrom fully support the jury's verdict" (People v Cobenais, 301 AD2d 958, 961 [2003] [internal citation omitted], lv denied 99 NY2d 653 [2003]; see People v Blair, 184 AD3d at 949-950; compare People v Small, 74 AD3d 843, 844-845 [2010], lv denied 16 NY3d 800 [2011]).
County Court did not err in denying defendant's motions to dismiss the indictment. Defendant premised both applications on the claim that the integrity of the grand jury proceedings was compromised when the prosecutor failed to correct the previously-noted inaccuracies in the officers' testimony. However, "[t]he dismissal of an indictment under CPL 210.35 (5) is an exceptional remedy and should be ordered only where there is 'prosecutorial wrongdoing, fraudulent conduct or errors [that] potentially prejudice the ultimate decision reached by the [g]rand [j]ury'" (People v Watson, 183 AD3d 1191, 1193 [2020], lv denied 35 NY3d 1049 [2020], quoting People v Huston, 88 NY2d 400, 409 [1996]). We find that the inaccuracies did not rise to this level. There was no evidence that the prosecutor knowingly presented false testimony to the jury or otherwise acted in bad faith, nor was there any showing that the officers' conduct was intentional or fraudulent. As for prejudice, the challenged statements primarily involved matters of nuance and detail that did not affect the substance of the officers' testimony pertaining to the elements of the charged offense. Most of the grand jury testimony was accurate, and those portions were amply sufficient to support the charge. Accordingly, we [*5]agree with County Court that the integrity of the proceeding was not impaired (see People v Watson, 183 AD3d at 1193-1194; People v Cruz-Rivera, 174 AD3d 1512, 1512-1513 [2019], lv denied 34 NY3d 1127 [2020]; People v Acevedo, 118 AD3d 1103, 1105-1106 [2014], lv denied 26 NY3d 925 [2015]).
Next, we reject defendant's contention that his repeated motions for a mistrial should have been granted on the ground that defendant was deprived of a fair trial when the prosecutor placed his personal integrity in issue during his summation. "Whether to grant a mistrial is committed to the sound discretion of the trial court where an error or legal defect in the proceedings, or conduct inside or outside the courtroom, is prejudicial to the defendant and deprives him [or her] of a fair trial" (People v Toland, 2 AD3d 1053, 1055 [2003] [internal quotation marks, ellipsis and citation omitted], lv denied 2 NY3d 808 [2004]). A court's decision on such a motion "will only be disturbed on review if the exercise of such discretion is clearly an abuse" (id. at 1055).
Here, defense counsel argued in summation, among other things, that the officers' credibility was diminished by their inaccurate statements before the grand jury. Counsel acknowledged that the officers' errors could have resulted from confusion with other arrests that they carried out during the three-day sting operation. However, counsel also asserted that the officers' grand jury testimony was "generous[ly], incorrect," that the officers had "embellished," "fib[bed]" and "fabricat[ed]" and that "they got their indictment based upon falsehoods shared by the three witnesses they called here to testify at trial." In response, the prosecutor argued that defense counsel had mischaracterized the purported errors, that the officers had not lied, and that their grand jury testimony was more accurate than defense counsel claimed. He stated that the inaccuracies did not make the Task Force officer "into a liar and a perjurer such that there is a conspiracy here," and then added, "Also note, if there was a conspiracy in [g]rand [j]ury it's me too." Defense counsel objected to this last remark, and County Court responded, "Your objection is noted." The prosecutor then completed his summation. Immediately afterward, County Court excused the jury for the day. After the jury departed, defense counsel moved for a mistrial or, in the alternative, a curative instruction, arguing that the prosecutor had improperly put his credibility in issue. The court asked the court reporter whether that part of the summation could be reviewed and whether anyone recalled the prosecutor's exact language. However, the transcript was not yet available and, after an off-the-record discussion, the trial was adjourned to the next day.
The following morning, County Court was provided with a transcript of the prosecutor's remarks. During a colloquy with counsel in the jury's absence, the court read the challenged remark into [*6]the record, stating that it now realized that it had not heard the latter part of the comment, pertaining to a conspiracy involving the prosecutor. The court said that if it had heard that part of the statement, it would have immediately "given a very strong curative instruction" or called counsel to the bench to discuss the appropriate curative action. The court stated that it had given defense counsel the opportunity to consider overnight what remedy he wished to request. Defense counsel argued that the prosecutor had made himself an unsworn witness and injected the integrity of his office into the case, that a curative instruction would be inadequate, and that the appropriate remedy would be a mistrial. He further argued that, if a mistrial was denied, the court should address the inaccuracies before the grand jury in a curative instruction in which it would marshal the evidence and advise the jury that the People conceded that the officers had made "false statements" before the grand jury and that the prosecutor had incorrectly argued otherwise. He further asked the court to reopen summations and to provide the jury with a readback of the testimony describing the inaccuracies, if the jury so wished. Finally, defense counsel stated that he was not requesting a curative instruction with specific regard to the prosecutor's conspiracy remark, saying that such an instruction would call undue attention to the issue.
County Court denied the request for a mistrial, finding that the prosecutor's response was "conduct that should not occur but [had] occurred innocently in the heat of battle," and that, although the prosecutor's remark had caused "prejudice," a mistrial would be an overly harsh remedy. The court declined to reopen summations or marshal the evidence,[FN1] but granted the request for a curative instruction in which it would advise the jury that the parties agreed that some of the officers' testimony before the grand jury had been inaccurate and that the jury could consider that fact in determining the officers' credibility. The court stated that it would instruct the jury that if it found that one or more of the officers had intentionally given false testimony about a material fact, it could reject all of that officer's testimony. Defense counsel did not express disagreement with the specifics of the proposed instruction, but reiterated that he believed that this remedy was insufficient, and that a mistrial was required.
It is well established that a prosecutor may not act as an unsworn witness by supporting arguments with his or her "own veracity and position" (People v Lovello, 1 NY2d 436, 439 [1956]). However, "[r]eversal of a conviction for prosecutorial misconduct is warranted only where a defendant has suffered substantial prejudice such that he or she was deprived of due process of law. In determining whether prosecutorial misconduct deprived a defendant of a fair trial, this Court considers its severity and frequency, the [*7]corrective action taken, if any, and whether the result would likely have been the same in the absence of the conduct" (People v Franqueira, 143 AD3d 1164, 1168 [2016] [internal quotation marks, brackets and citations omitted]; see People v Weber, 40 AD3d 1267, 1268 [2007], lv denied 9 NY3d 927 [2007]). Applying these standards, we find that the prosecutor's remark, although improper, was isolated and was not part of a "flagrant and pervasive pattern of prosecutorial misconduct" (People v McCombs, 18 AD3d 888, 890 [2005] [internal quotation marks and citations omitted]; accord People v Delaney, 42 AD3d 820, 822 [2007], lv denied 9 NY3d 922 [2007]). County Court's response was unfortunately delayed by its failure to hear the remark, and it was required to excuse the jury immediately after conclusion of the summation, as the workday had ended. Nevertheless, the court took action to dilute its effect the next day by granting defense counsel's request for a "falsus in uno" instruction, and by giving an adverse inference charge with regard to the investigator's failure to provide the grand jury with the full Kik exchange. The court further offered to admonish the prosecutor in the jury's presence for his conspiracy remark, but accepted the decision of defense counsel to decline such an instruction.
Turning to the effect of the prosecutor's remark upon the outcome of the trial, we agree with County Court that the prosecutor's invocation of his own credibility was improper and caused some prejudice to defendant. However, as the court noted, the remark should be considered in the context of defense counsel's arguments in summation about the officers' inaccurate testimony before the grand jury and, specifically, that "they got their indictment based upon falsehoods shared by the three witnesses they called here to testify at trial" (emphasis added). The court found, and we agree, that while defense counsel's impeachment of the officers' credibility was "professional and appropriate," the statement about falsehoods "could [have been] perceived as an attack upon the integrity of the [g]rand [j]ury or . . . the [prosecutor]" (compare People v Marks, 6 NY2d 67, 77-78 [1959]; People v Gumbs, 56 AD3d 345, 348-349 [2008], lv denied 12 NY3d 758 [2009]). In this context, and in view of the isolated nature of the comment, the thorough — albeit belated — curative action taken by the court and the fact that, given defendant's admissions and the physical evidence, resolution of the matter did not depend solely upon credibility assessments, we find that the prosecutor's remark did not cause such "substantial prejudice" as to deprive defendant of due process or of a fair trial (People v Weber, 40 AD3d at 1268). We thus find that County Court did not abuse its discretion in denying a mistrial (see People v Marks, 6 NY2d at 77-78; People v Weber, 40 AD3d at 1268; see also People v Typhair, 12 AD3d 832, 834 [2004], lv denied 4 NY3d 803 [2005]; compare People v Lovello[*8], 1 NY2d at 438-439).
Finally, defendant argues that he was deprived of his constitutional right to a jury trial by County Court's failure to hear the pertinent portion of the prosecutor's remark, which he alleges was such a significant failure of the court's duty to supervise the trial that it was equivalent to a de facto absence from the courtroom. Defendant raised this claim for the first time upon appeal, despite opportunities to make timely objections when the court "noted" the objection to the remark rather than sustaining it, when he moved for a mistrial immediately after the summation based solely upon the prosecutor's alleged misconduct and, again, during the colloquy that took place the next day. A claim that a defendant's right to a jury trial was denied as a result of a judge's alleged inattentiveness — unlike such a claim based upon the judge's physical absence from the courtroom or delegation of the duty to supervise the trial — must be preserved for appellate review by a timely objection (see People v Degondea, 3 AD3d 148, 162-163 [2003], lv denied 2 NY3d 798 [2004]; compare People v Bayes, 78 NY2d 546, 551 [1991]; People v Pinkney, 272 AD2d 52, 52-53 [2000], lv denied 95 NY2d 937 [2000]; People v Lumpkin, 173 AD2d 738, 740-741 [1991]). Even had the issue been preserved, we would not have found that County Court's inadvertent failure to hear part of a single remark constituted a failure of its duty to supervise the trial or that it deprived defendant of his right to a jury trial (compare People v Toliver, 89 NY2d 843, 844-845 [1996]; People v Ahmed, 66 NY2d 307, 310-312 [1985]).
Egan Jr., Mulvey, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed, and matter remitted to the County Court of Ulster County for further proceedings pursuant to CPL 460.50 (5).



Footnotes

Footnote 1: Defendant does not challenge these two determinations upon this appeal.