People v Dickinson (2020 NY Slip Op 02291)





People v Dickinson


2020 NY Slip Op 02291


Decided on April 16, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 16, 2020

109325

[*1]The People of the State of New York, Respondent,
v
Shannon Dickinson, Appellant.

Calendar Date: February 13, 2020

Before: Garry, P.J., Lynch, Mulvey, Aarons and Reynolds Fitzgerald, JJ.


Rural Law Center of New York, Castleton (Kelly L. Egan of counsel), for appellant.
Jason M. Carusone, District Attorney, Lake George (Rebecca Nealon of counsel), for respondent.



Lynch, J.
Appeal from a judgment of the County Court of Warren County (Hall Jr., J.), rendered October 19, 2016, upon a verdict convicting defendant of the crimes of sexual abuse in the first degree, luring a child and endangering the welfare of a child.
In August 2015, defendant was charged by indictment with criminal sexual act in the first degree, criminal sexual act in the second degree, sexual abuse in the first degree, luring a child and endangering the welfare of a child. The indictment stemmed from defendant engaging in inappropriate sexual conduct with his then-girlfriend's 13-year-old daughter (hereinafter the victim) at a hotel in the Town of Queensbury, Warren County. Following a jury trial, defendant was convicted of sexual abuse in the first degree, luring a child and endangering the welfare of a child.[FN1] Defendant moved to set aside the verdict and for recusal, but County Court denied both motions. Thereafter, the court sentenced defendant, as a persistent felony offender, to concurrent prison terms of 15 years to life for his convictions of sexual abuse in the first degree and luring a child, and to a concurrent term of one year for his conviction of endangering the welfare of a child. Defendant appeals.
Initially, defendant contends that his conviction of luring a child is not supported by legally sufficient evidence and is against the weight of the evidence, and his conviction of sexual abuse in the first degree is also against the weight of the evidence. "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Flower, 173 AD3d 1449, 1450 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 931 [2019]; see People v Robinson, 156 AD3d 1123, 1124 [2017], lv denied 30 NY3d 1119 [2018]). In contrast, "[w]hen undertaking a weight of the evidence review, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Kelsey, 174 AD3d 962, 963 [2019] [internal quotation marks, brackets and citations omitted], lv denied 34 NY3d 982 [2019]; see People v Butkiewicz, 175 AD3d 792, 793 [2019], lv denied 34 NY3d 1076 [2019]).
As charged in the indictment, to convict defendant of luring a child, the People had to show that he "lure[d] a child into a . . . building . . . for the purpose of committing" the crime of criminal sexual act in the first degree (Penal Law § 120.70 [1]; see Penal Law § 130.50 [1]). A person intends to commit criminal sexual act in the first degree when he or she intends to "engage[] in oral sexual conduct or anal sexual conduct with another person . . . [b]y forcible compulsion" (Penal Law § 130.50 [1]). To convict defendant of sexual abuse in the first degree, the People were required to show that he "subject[ed] another person to sexual contact . . . [b]y forcible compulsion" (Penal Law § 130.65 [1]). "[S]exual contact" is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party" (Penal Law § 130.00 [3]).
At trial, the victim testified that she was born in December 2001. As to the incident, the victim testified that on July 28, 2015, defendant picked her up and they went to the hotel. She stated that she was wearing black and pink shorts and a white tank top. On their way, defendant stopped at a liquor store, where he purchased alcohol, and at a Dollar Store, where the victim purchased Gatorade to mix with the alcohol. According to the victim, defendant handed her two shooters filled with vodka, which she drank. At the hotel, defendant and the victim got a handicapped accessible room because defendant has a disability and was using a wheelchair. Once in the room, defendant made alcoholic drinks, which the victim drank, they ordered pizza and listened to music. After drinking five or six cups, the victim felt sick and vomited. She then fell asleep on the bed while defendant was sitting in his wheelchair across the room. The victim further testified that, at some point, she woke up and observed that defendant was now in bed next to her, without his shirt, and that he began touching her intimate part with his finger and then with his tongue. The victim told defendant to stop and kicked his head, but, since she was still feeling sick, she "passed out again." According to the victim, when she woke up again, she observed that defendant was still next to her and that she was not wearing any clothes. She then got out of bed, grabbed extra clothes from the bag that she had brought and messaged her friend to ask him if she could come to his house. The victim also observed that she had some vaginal bleeding.
Thereafter, in the early morning of July 29, 2015, defendant drove the victim to the friend's house. The victim explained that she disclosed what had happened to the friend, as well as to her other friends. The victim also went to the police station and disclosed what had occurred. The victim acknowledged that she had gone to counseling and received in-patient treatment several times in the past due to her depression and other harmful behaviors. The victim also admitted that she had previously alleged that her father sexually abused her, but later recanted those allegations. She explained that those allegations of abuse against the father were true, but she recanted them because she did not want to end up in foster care. She also said that she had previously accused another male of touching her, but that she made those allegations when she was three years old and under her father's direction.
Various witnesses corroborated parts of the victim's testimony. The victim's friend testified confirming that the victim messaged him and that, when she came over the next morning, she was crying and told him that defendant had touched her. The testimony from the front desk managers at the hotel confirmed that defendant and a young girl checked into the hotel and that, after they checked out, there was vomit in their room. The owner of the liquor store also testified, confirming defendant's visit to the liquor store on the day of the incident, which was captured on the store's security camera. Two inmates at a correctional facility, who met defendant in jail, also testified. The inmates stated that defendant admitted to inappropriately touching the victim with his fingers at the hotel. Both inmates were cross-examined regarding their extensive criminal history.
A sexual assault nurse examiner (hereinafter SANE) testified that she conducted a sexual assault examination of the victim on July 30, 2015. The SANE noted that the victim claimed memory loss resulting from alcohol consumption. The victim also consistently described how and where the incident occurred. After the examination, the SANE noted that external trauma to the victim's body, as well as a small amount of bleeding, was consistent with the victim's description of the incident. The SANE further testified that the victim told her she had only changed her shirt since the assault, and the SANE collected the victim's clothing, including underwear and pants — but not the shorts that the victim testified to wearing at the time of the incident. A forensic scientist with the State Police testified concerning the DNA analysis that she performed on the victim's clothing that was recovered during the SANE's examination. The DNA testing revealed that defendant was the major contributor to the profiles from the swabs of the inside and outside of the underwear waistband, the inside and outside of the pants waistband and the cutting from the crotch area of the pants. The forensic scientist explained that being the major contributor meant that defendant and his biological paternal relatives could not be excluded as being major contributors to the DNA profiles tested. However, due to insufficient genetic information, no comparisons could be made to the minor contributors to these profiles. Finally, a profile from the swabs of the inside of the pants crotch area was consistent with the DNA from at least four male donors, so no comparisons could be made.
An investigator with the State Police testified that he took the victim's statement and asked her to make a controlled call to defendant. During the controlled call, the investigator heard defendant say, in relation to taking the victim to the hotel, that it was "stupid" and that if she reported it, she would go to foster care. The investigator further testified that he conducted a traffic stop of defendant and asked him to come to the barracks, where he then conducted an interview. During the interview, defendant admitted that he took the victim to the hotel because it was very hot outside and that the pair "[h]ung out and watched TV." Defendant initially denied purchasing alcohol that night, but subsequently admitted to purchasing a bottle of vodka and some vodka shooters after being shown security footage from the store. He denied that the victim drank the alcohol and, when asked what happened during the night, he stated, "I don't know."
For his part, defendant testified that he had a disability from paraplegia and had no movement from the waist down. He stated that he first met the victim when he started dating her mother and has known the victim for about two to three years. As to the incident, defendant testified that he went with the victim to the hotel because she wanted to be in air conditioning. According to defendant, the victim was wearing shorts and a tank top. Before he checked in at the hotel, he went to the liquor store and purchased four shooters and a bottle of vodka, while the victim went into the Dollar Store and bought candy and Gatorade. He stated that no alcohol was consumed before the two arrived at the hotel and that he alone consumed the vodka and the shooters at the hotel. Defendant then went to sleep around 10:00 p.m. or 11:00 p.m. that night, but, around midnight, he woke up to vomit. Defendant further testified that, in the morning, he had a conversation with the victim that resulted in the victim being very upset with him. Defendant denied ever engaging in sexual activity with the victim or making statements to the inmates.
Defendant contends that the evidence was legally insufficient to convict him of luring a child — which required him to have an intent to commit the underlying crime of criminal sexual act in the first degree — since he was acquitted of the crime of criminal sexual act in the first degree and there was no other evidence of his intent to commit the underlying crime. We disagree. As defendant acknowledges, in order to find him guilty of luring a child, the jury had to find that he had an intent to commit the crime of criminal sexual act in the first degree, not that he actually committed the underlying crime (see Penal Law § 120.70 [1]). Here, defendant's intent to "engage in oral sexual conduct . . . with [the victim] . . . [b]y forcible compulsion" (Penal Law § 130.50 [1]) can be inferred from the testimony, as well as physical and circumstantial evidence, that he brought the victim to a hotel room with one bed, purchased alcohol and had the victim drink that alcohol before and after arriving at the hotel, was lying next to the victim in the bed and engaged in inappropriate sexual activity with the victim (see People v Brown, 251 AD2d 694, 695 [1998], lv denied 92 NY2d 1029 [1998]; People v Roe, 235 AD2d 950, 952 [1997], lv denied 89 NY2d 1099 [1997]). Although the jury ultimately determined that defendant did not engage in oral sexual contact with the victim — effectively rejecting her testimony that he did (see People v Bush, 14 AD3d 804, 804-805 [2005], lv denied 4 NY3d 852 [2005]) — such determination did not preclude the jury from finding that he intended to engage in such conduct when he brought the victim to the hotel room. Intent may be inferred from defendant's conduct and the surrounding circumstances (see People v Smith, 79 NY2d 309, 315 [1992]; People v McCloud, 121 AD3d 1286, 1287 [2014], lv denied 25 NY3d 1167 [2015]). Viewing this evidence in light most favorable to the People, we find that the verdict as to luring a child is supported by legally sufficient evidence (see People v Horton, 173 AD3d 1338, 1340 [2019], lv denied 34 NY3d 933 [2019]; People v Kalina, 149 AD3d 1264, 1266 [2017], lv denied 29 NY3d 1092 [2017]).
Turning next to the weight of the evidence, although a different verdict would not have been unreasonable, we find that the verdict as to the crimes of luring a child and sexual abuse in the first degree was not against the weight of the evidence. The victim testified to defendant providing her alcohol and then to sexually touching her. The victim's account of the events was corroborated by the testimony of the friend, the hotel's front desk managers, the liquor store owner and the SANE, who stated that the victim's injuries were consistent with her description of the incident. Additionally, two jail inmates testified that defendant admitted to engaging in inappropriate sexual conduct with the victim. Although the victim's testimony as to what she wore at the time of the incident differed from what she had disclosed to the SANE, and the victim had a history of mental health issues and previously recanted allegations of sexual assault she had made against other individuals, these issues were thoroughly explored during her cross-examination, and we cannot say that her testimony is incredible as a matter of law (see People v Butkiewicz, 175 AD3d 792, 795 [2019], lv denied 34 NY3d 1076 [2019]; People v Wright, 155 AD3d 1452, 1454 [2017], lv denied 30 NY3d 1121 [2018]). Additionally, although defendant's testimony differed from that of the victim and he provided explanations as to how his DNA could have ended up on her clothes, this presented a credibility determination for the jury to resolve (see People v Kiah, 156 AD3d 1054, 1056 [2017], lv denied 31 NY3d 984 [2018]; People v Gathers, 47 AD3d 959, 960 [2008], lv denied 10 NY3d 863 [2008]; People v Allen, 13 AD3d 892, 894 [2004], lv denied 4 NY3d 883 [2005]). Based on the foregoing, we find the verdict as to these convictions is supported by the weight of the evidence (see People v Russell, 116 AD3d 1090, 1092 [2014]; People v Weber, 40 AD3d 1267, 1268 [2007], lv denied 9 NY3d 927 [2007]).
Next, defendant contends that County Court erroneously admitted DNA reports into evidence because the tested items were allegedly not the items that the victim wore at the time of the incident. As defendant concedes, he failed to preserve this contention because he did not object to the admission of the DNA reports on the specific ground he now raises on appeal (see CPL 470.05 [2]; People v Peele, 73 AD3d 1219, 1221 [2010], lv denied 15 NY3d 894 [2010]). Were this argument preserved, we would find that the People provided sufficient assurances of the identity and unchanged condition of victim's clothing that was collected by the SANE and given to the forensic scientist, and any discrepancies in the victim's description of what she was wearing on the day of the incident go to the weight of the evidence and not to its admissibility (see People v Hawkins, 11 NY3d 484, 494 [2008]; People v Inman, 134 AD3d 1434, 1436 [2015], lv denied 27 NY3d 999 [2016]; People v Shoga, 89 AD3d 1225, 1226 [2011], lv denied 18 NY3d 886 [2012]). Relatedly, defendant failed to preserve his contention that the SANE's testimony as to what the victim had disclosed to wearing at the time of the incident was hearsay. Were this argument preserved, we would find that this question had the dual purpose of assisting in the investigation of the crime and the care and treatment of the victim's injuries, and, as such, the victim's responses were properly admitted as an exception to the hearsay rule (see People v Blackman, 90 AD3d 1304, 1309 [2011], lv denied 19 NY3d 971 [2012]; People v Rogers, 8 AD3d 888, 892 [2004]).
Defendant also acknowledges that he failed to preserve his contention that the prosecutor engaged in misconduct when he misrepresented the results of the DNA analysis by stating that defendant was a "major contributor" to certain DNA profiles tested (see CPL 470.05 [2]; People v Andrade, 172 AD3d 1547, 1553 [2019], lv denied 34 NY3d 928 [2019]). Were this issue properly preserved, we would find that the prosecutor's statements constituted fair comment on the evidence, as they were based on the DNA reports as well as the testimony of the forensic examiner (see People v Stasiak, 25 AD3d 1025, 1026-1027 [2006]; People v Jones, 283 AD2d 665, 668 [2001], lv denied 96 NY2d 903 [2001]).
We are also unpersuaded by defendant's contention that he was deprived of the effective assistance of counsel because of his counsel's alleged failure to make certain pretrial motions or objections at trial. "A claimed violation of the constitutional right to the effective assistance of counsel will not survive judicial scrutiny so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Saunders, 176 AD3d 1384, 1391 [2019] [internal quotation marks and citations omitted]; see People v Wilson, 164 AD3d 1012, 1019 [2018]). First, contrary to defendant's contention, defense counsel was not ineffective for failing to object to the admission of the DNA reports, the hearsay statements within the reports or to characterizations of the DNA results made by the prosecutor because, as set forth above, such objections would have little or no chance of success (see People v Caban, 5 NY3d 143, 152 [2005]; People v Hackett, 167 AD3d 1090, 1095 [2018]). Moreover, as defense counsel did not have a colorable basis upon which to request a Frye hearing regarding the DNA methods employed, his failure to do so does not amount to ineffective assistance (see People v VanDeusen, 129 AD3d 1325, 1327 [2015], lv denied 26 NY3d 972 [2015]; compare People v Wilson, 164 AD3d at 1019-1021). Defendant further contends that defense counsel failed to request suppression of defendant's statements (see CPL 710.30) or a Huntley hearing. However, the failure to request a particular hearing, without more, does not constitute ineffective assistance, and there is no evidence suggesting that defendant's statements were involuntary (see People v Smith, 89 AD3d 1148, 1149 [2011], lv denied 19 NY3d 968 [2012]; People v Perea, 27 AD3d 960, 961 [2006]; compare People v Carnevale, 101 AD3d 1375, 1379 [2012]). Overall, the record reflects that defense counsel opposed the People's motion to compel a DNA sample, advanced several motions, effectively cross-examined the People's witnesses and obtained acquittals of the top two counts of the indictment. As such, we are satisfied that defendant received meaningful representation (see People v Houze, 177 AD3d 1184, 1188-1189 [2019], lv denied ___ NY3d ___ [Feb. 21, 2020]; People v Mamadou, 172 AD3d 1524, 1526 [2019], lv denied 33 NY3d 1106 [2019]).
Lastly, we are unpersuaded that County Court was biased or abused its discretion in sentencing defendant. The record contains no evidence of judicial bias or a basis for recusal (see People v Swartz, 160 AD3d 1296, 1297 [2018]). The court properly sentenced defendant as a persistent felony offender because he was convicted of three prior felonies that resulted in him being incarcerated for more than one year on each conviction (see Penal Law § 70.10 [1]; People v O'Connor, 6 AD3d 738, 740 [2004], lv denied 3 NY3d 645 [2004]). Moreover, the court properly determined that defendant's "history and character" and "the nature and circumstances of his criminal conduct are such that extended incarceration and lifetime supervision of [him] are warranted to best serve the public interest" (CPL 400.20 [1] [b]). The court addressed defendant's criminal history that spans for 26 years — including 16 arrests, 12 convictions in New York as well as one federal conviction and violations of parole — and also stated that defendant "is an incorrigible and intractable individual whose life style is inimical to life in a law abiding society." Accordingly, we cannot conclude that the court abused its discretion in sentencing defendant as a persistent felony offender (see People v Swartz, 160 AD3d at 1296; People v O'Connor, 6 AD3d at 741). Considering defendant's extensive criminal history, his lack of remorse for the crimes that he committed and the impact of such crimes on the 13-year-old victim, we find that the ultimate sentence was not harsh or excessive (see People v Horton, 173 AD3d at 1342; People v Wicks, 73 AD3d 1233, 1237 [2010], lv denied 15 NY3d 867 [2010]). Defendant's remaining contentions, to the extent that they are not addressed herein, have been examined and found to be without merit.
Garry, P.J., Mulvey, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Defendant was acquitted of the charges of criminal sexual act in the first and second degrees.