People v Warner (2021 NY Slip Op 02840)





People v Warner


2021 NY Slip Op 02840


Decided on May 6, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:May 6, 2021

109457
[*1]The People of the State of New York, Respondent,
v
Paul M. Warner, Appellant.

Calendar Date:March 9, 2021

Before:Garry, P.J., Lynch, Clark, Pritzker and Colangelo, JJ.

Michelle E. Stone, Vestal, for appellant.
Michael A. Korchak, District Attorney, Binghamton (Geoffrey B. Rossi of counsel), for respondent.



Lynch, J.
Appeal from a judgment of the County Court of Broome County (Dooley, J.), rendered May 19, 2017, upon a verdict convicting defendant of the crimes of attempted murder in the second degree, attempted assault in the first degree, assault in the second degree and overdriving, torturing and injuring animals; failure to provide proper sustenance.
On September 24, 2016, a physical altercation took place in Broome County between current and former members of the Flesh and Blood motorcycle club. During the melee, defendant allegedly fired a shotgun at the victim's van, causing injury to the victim and his dog. In connection therewith, defendant was charged by indictment with attempted murder in the second degree, attempted assault in the first degree, assault in the second degree and overdriving, torturing and injuring animals; failure to provide proper sustenance. Prior to trial, defendant filed an omnibus motion seeking, among other things, suppression of certain evidence seized from the motorcycle clubhouse. County Court summarily denied defendant's motion for lack of standing, finding that he failed to allege any personal privacy interest in the area searched. A jury trial ensued, during which defendant raised a justification defense. Defendant was ultimately convicted as charged and sentenced to concurrent prison terms of 12 years, with five years of postrelease supervision, on the convictions of attempted murder in the second degree and attempted assault in the first degree, and to lesser concurrent terms on the remaining convictions. Defendant appeals.
We affirm. Initially, defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Dickinson, 182 AD3d 783, 783 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1065 [2020]; see People v Rudge, 185 AD3d 1214, 1215 [2020], lv denied 35 NY3d 1070 [2020]). By contrast, when conducting a weight of the evidence review, this Court "must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Meadows, 183 AD3d 1016, 1017 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1047 [2020]; see People v Rahaman, 189 AD3d 1709, 1710-1711 [2020], lv denied 36 NY3d 1059[*2][2021]).
As relevant here, a person commits attempted murder in the second degree when, "with intent to cause the death of another, [he or she] engage[s] in conduct that tend[s] to effect the commission of that crime" (People v Greenfield, 167 AD3d 1060, 1061 [2018], lv denied 32 NY3d 1204 [2019]; see Penal Law §§ 110.00, 125.25 [1]). As to attempted assault in the first degree, the People were required to prove that defendant, "[w]ith intent to cause serious physical injury to another[,]
. . . attempted to cause such injury by means of a deadly weapon or dangerous instrument" (People v Watson, 174 AD3d 1138, 1139 [2019] [internal quotation marks, ellipsis and citation omitted], lv denied 34 NY3d 955 [2019]; see Penal Law §§ 110.00, 120.10 [1]; People v Conway, 179 AD3d 1218, 1219 [2020], lv denied 35 NY3d 941 [2020]).[FN1] "Serious physical injury" means, as relevant here, "physical injury which creates a substantial risk of death, or which causes . . . serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]). "Physical injury," in turn, means "impairment of physical condition or substantial pain" (Penal Law § 10.00 [9]). As to the charge of assault in the second degree, the People were required to prove that defendant, "[w]ith intent to cause physical injury to another person, cause[d] such injury to such person . . . by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.05 [2]). To convict defendant of overdriving, torturing and injuring animals — a misdemeanor offense — the People were required to prove, as relevant here, that defendant "unjustifiably injured, maimed, [or] mutilated" an animal (Agriculture and Markets Law § 353; see People v Bowe, 61 AD3d 1185, 1186 [2009], lv denied 12 NY3d 923 [2009]).
At trial, the victim testified that he was a former member of the motorcycle club, having been removed around March 2016 due to a monetary dispute. Following his departure, a disagreement arose concerning construction equipment that the victim believed the motorcycle club was wrongfully withholding from him. He testified that, on the afternoon of September 24, 2016, he was standing in his driveway with a friend when he observed defendant's burgundy pickup truck slowly drive by. Another member of the club was sitting in the passenger seat and, according to the victim, was leaning out of the window and waiving something that appeared to be a camera or a gun. The truck then proceeded down the road and out of sight. A few minutes later, the victim observed a silver car approach his residence, which contained another member of the club who was hanging out of the passenger window "brandishing something in the same manner." The victim testified that he put his dog in the passenger seat of his white utility van and pursued the silver car, at one point stopping "nose to nose" with it on the side of the road. When the [*3]victim got out of the van to confront the driver, the silver car drove away and the victim followed.
The victim proceeded to the motorcycle clubhouse, where he observed one of the members attempting to hide behind a pickup truck. The victim testified that he grabbed a billy club and a can of pepper spray from his van, approaching the club member to confront him. Two more club members came outside at that time and the victim admitted that he began hitting them with the billy club to keep them in front of him. The victim then saw defendant run out of the clubhouse with another individual. The victim testified that he used pepper spray on the group and could hear his dog barking in the car during the altercation. Realizing that he was outnumbered, the victim retreated to his car, backed into the street and began to pull away. He then heard one of the club members say "shoot," and saw defendant run towards the van with a shotgun. The victim explained that he pushed the dog's head down and heard the shotgun go off, knowing almost immediately that he was hit based upon the blood he coughed up on the windshield. The victim then drove to a nearby delicatessen, where he obtained help after a bystander called 911.
The People entered into evidence the surveillance video from the incident, which tended to corroborate the victim's testimony. On the video, the victim can be seen pulling his van into the parking lot of the motorcycle clubhouse, with the outline of a dog shown in the passenger's seat. The victim then exits the vehicle with a billy club and walks toward the front of a burgundy pickup truck. A member of the club exits the clubhouse with something in his hand and follows the victim behind the pickup truck. The victim then backs up toward his van, with several club members coming towards him. The victim begins hitting the club members with a billy club and defendant runs outside of the clubhouse with a long pole in his hand, walking past the passenger's side of the victim's van — where the outline of a dog can be seen — and toward the victim, who is using pepper spray on the group. Defendant then runs back toward the front of the clubhouse as the victim continues to use pepper spray and eventually walks back to his van. The victim gets back into the driver's side of the van, one of the club members throws something at it, and the victim reverses the van to the left so that the passenger side is facing perpendicular to the front of the clubhouse. Defendant then runs into the frame with a shotgun, takes aim and shoots as the victim is moving the van forward to leave.
The witness testimony also supported the victim's recitation of the incident. In that respect, a high school student testified that she was at a nearby laundromat on the date of the incident when she saw "five or six guys coming down the street arguing," some of whom were carrying pipes. She observed a white van in the vicinity and, toward the end of the altercation[*4], heard one of the men say, "Where is my shotgun?" According to this witness, the crowd then dispersed and one of the individuals got into the van and started to reverse it. At that point, the witness saw a dog pop its head up from the passenger side of the van, heard a shot and then heard someone yell "ow."
With respect to the nature of the victim's injuries, an emergency room physician testified that he presented to the hospital with "a significant amount of blood . . . on his upper torso and from the neck, chest and abdominal area down." The physician testified that the victim had multiple penetrating gunshot wounds to his body, his pulse was "very fast" and several shotgun pellets were located at the periphery of his right lung. The physician described the victim as appearing to be "in a significant amount of discomfort and pain," noting that he was having trouble breathing. Although not shown on an initial X ray, the physician suspected defendant had a pneumothorax (hereinafter a collapsed lung). A chest tube was eventually inserted, defendant was intubated, and he was admitted to the hospital, where he remained for a week. The physician explained that "[m]ost people [do not] survive collapsing their lung" and a failure to provide aggressive treatment leads to an increased risk of morbidity and mortality. As to the dog's injuries, a witness who located the dog in the driver's seat after the shooting testified that, although the dog seemed calm when he approached, he noticed blood on his hands after petting the dog. A state trooper also recalled seeing blood on the dog following the incident, and the People entered into evidence pictures depicting small wounds on the top of the dog's head that appear consistent with having been hit with shotgun pellets.
The People also played for the jury a portion of a video of defendant's investigatory questioning. On the video, defendant told investigators that, by the time he came out of the clubhouse, there was "glass on the ground" and the victim was already "on his way down the road." He later changed his story, claiming that there was a fight and that he saw a bulge near the victim's waistband, but nevertheless indicating that he did not know how the victim was shot.
Members of the club testified on defendant's behalf, explaining that the victim had engaged in intimidating behavior three days prior to the incident. To that end, they testified that the victim showed up at the motorcycle clubhouse on September 21, 2016 and began yelling "you're all done" and "I'll be back, you watch." Defendant also took the stand, explaining that he had known the victim for approximately four years at the time of the incident and describing him as a "bully" who was known to carry weapons. Defendant explained that, after the victim was expelled from the club, the victim began engaging in intimidating behavior, including driving past defendant's house and staring at him in an aggressive manner. With respect [*5]to the encounter on September 21, 2016, defendant testified that he was present when the victim was yelling at club members outside of the clubhouse, stating that the victim looked as if he was going to lunge at one of them and had a black bulge at his waistband. On that date, the victim was wearing a black denim vest with the name of a rival club on it, which defendant found to be "very threatening." Defendant encountered the victim twice more between September 21, 2016 and September 24, 2016 — once while the victim was pumping gas and another time while stopped at a red light. According to defendant, the victim glared at him in an intimidating manner on both of those occasions.
As to the underlying incident on September 24, 2016, defendant explained that he saw the victim outside of the clubhouse "smashing" one of the club members with a billy club. Defendant maintained that, during the encounter, he heard an unidentified person yell, "He's got a gun," prompting defendant to run inside of the clubhouse to get a shotgun. Defendant further testified that, when he ran back outside, he saw the victim in the driver's seat pointing a gun at him and feared for his life. Although defendant admitted to firing the shotgun in the victim's direction, he maintained that he did not intend to kill or injure the victim, noting that he shot at the door. He further testified that he did not see a dog in the van and had no intention of shooting a dog.
When viewing the evidence in the light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could conclude that defendant committed all of the crimes charged (see People v Rudge, 185 AD3d at 1215; People v Dickinson, 182 AD3d at 783). Accordingly, the verdict is based upon legally sufficient evidence. As to the weight of the evidence, a different verdict would not have been unreasonable. Nevertheless, when viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we conclude that the People proved the elements of the crimes beyond a reasonable doubt (see People v Speed, 134 AD3d 1235, 1236 [2015], lv denied 27 NY3d 1155 [2016]; People v Smith, 123 AD3d 450, 451 [2014], lv denied 27 NY3d 1006 [2016]; People v Mullings, 23 AD3d 756, 758 [2005], lv denied 6 NY3d 756 [2005]). Contrary to defendant's contention, his homicidal intent can be readily inferred from his conduct of taking a direct shot at the victim from a relatively short distance while the victim was in the process of retreating (see People v Rahaman, 189 AD3d at 1711; People v Meadows, 180 AD3d 1244, 1247 [2020], lv denied 35 NY3d 994 [2020]; People v Conway, 179 AD3d at 1219; People v Pine, 126 AD3d 1112, 1115 [2015], lv denied 27 NY3d 1004 [2016]). Moreover, "[t]he absence of a long-term serious injury to a victim does not preclude the finding of life-threatening actions by a defendant" (People v Ryder, 146 AD3d 1022, 1024 [2017], lv denied [*6]29 NY3d 1086 [2017]), and the proof that the victim suffered symptoms associated with a collapsed lung, necessitating the placement of a chest tube and intubation, was sufficient to establish that defendant came "dangerously near" the commission of the completed crimes (People v Kassebaum, 95 NY2d 611, 618 [2001], cert denied 532 US 1069 [2001]).
Moreover, the People disproved defendant's justification defense beyond a reasonable doubt. The surveillance video clearly established that defendant ran toward the vehicle on his own volition and took the shot while the victim was in the process of driving away (see Penal Law § 35.15 [2] [a]; People v Brown, 187 AD2d 312, 313 [1992], lv denied 81 NY2d 837 [1993]). Although defendant testified that he feared for his life because he believed the victim was pointing a gun at him, the jury could reasonably reject defendant's version of the events, particularly where, as here, the surveillance video does not show the victim with a gun or depict any of the club members scatter as if attempting to flee from one, defendant was not forthcoming with police regarding his role in the shooting and defendant did not indicate during his investigatory questioning that the victim pointed a gun at anyone during the encounter (see People v Allen, 183 AD3d 1284, 1286 [2020], affd 36 NY3d 1033 [2021]; People v Every, 146 AD3d 1157, 1162 [2017], affd 29 NY3d 1103 [2017]).
As to the remaining counts, we reject defendant's argument that the People did not establish the physical injury component of assault in the second degree. The testimony that the victim appeared to be in significant pain and was having trouble breathing upon arriving at the hospital, where he remained for a week, was sufficient to establish the physical injury component of this crime (see Penal Law §§ 10.00 [9]; 120.05 [2]). With respect to the charge of overdriving, torturing and injuring animals, the photographs depicting what appear to be gunshot wounds on the dog's head and the testimony from a witness who described blood on his hands after petting the dog sufficiently established the physical injury element of that crime. Although defendant testified that he had no knowledge of the dog's presence in the vehicle, the jury could reasonably discredit this contention, as the victim testified that he could hear the dog barking during the altercation, defendant was standing within a few feet from the dog moments before he fired the weapon, and an independent witness testified that she could see the dog immediately prior to the shooting. Moreover, the fact that defendant lacked the intent to shoot the dog is irrelevant, as "there is no requirement that the person have a culpable mental state to be found guilty of violating [Agriculture and Markets Law §] 353" (People v Robinson, 56 Misc 3d 77, 79 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2017], lv denied 30 NY3d 953 [2017]; see Agriculture and Markets Law § 43; People v Basile, 40 Misc 3d 44, 46 [[*7]App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2013], affd 25 NY3d 1111 [2015]). Accordingly, the verdict on all counts is based upon legally sufficient evidence and is not against the weight of the evidence.
We are unpersuaded by defendant's claims of ineffective assistance of counsel. First, he faults counsel for failing to assert that he had a reasonable expectation of privacy in the clubhouse in his pretrial suppression motion. This claim is unavailing since any such argument had little chance of success (see People v Santana, 179 AD3d 1299, 1302 [2020], lv denied 35 NY3d 975 [2020]; People v Rodriguez, 303 AD2d 783, 785-786 [2003]). Nor has defendant established that he was deprived of meaningful representation with respect to the manner in which counsel handled a juror contact issue. On the third day of the trial, the prosecutor brought to County Court's attention that one of the People's witnesses — a police investigator — had been approached by a juror. Upon inquiry, the witness explained that, while he was waiting in court to testify, a juror approached him and stated that he thought the prosecutor "was very meticulous [and] . . . seemed to be doing a good job." When the juror started to talk about the photographic evidence, the witness put his hand up and told the juror that "we can't talk about this." In response to this information, defense counsel requested that the court provide the jury with a general admonition reminding the jurors not to discuss the case with anyone. Although defense counsel declined the court's offer to inquire of the particular juror directly, counsel did approve of the court's proposal to inform the jury that it had come to the court's attention that a juror had improperly spoken to a witness that morning. The jury was so instructed. Although the juror's conduct was inappropriate, "not every misstep by a sworn juror is indicative of substantial misconduct or renders the juror grossly unqualified" (People v Paulino, 131 AD3d 65, 72 [2015], lv denied 26 NY3d 1042 [2015]). Given the limited nature of the juror contact and the fact that his statements were not indicative of bias, we cannot conclude that counsel's decision to seek only a general admonition deprived defendant of meaningful representation (see generally People v Buford, 69 NY2d 290, 299 n 4 [1987]; People v Montes, 178 AD3d 1283, 1287-1288 [2019], lv denied 34 NY3d 1161 [2020]; People v Paulino, 131 AD3d at 72; People v Matiash, 197 AD2d 794, 796 [1993], lvs denied 82 NY2d 899 [1993]).
We further reject defendant's contention that County Court committed reversible error in denying his request for a missing witness charge related to the People's failure to produce a radiologist who reported that he did not observe a collapsed lung on the victim's initial X ray. As noted above, the emergency room physician testified that he suspected that the victim suffered a collapsed lung and treated him accordingly. As such, the People did not need to [*8]call the radiologist as a witness. Moreover, the radiologist would be expected to testify as to his medical findings, making him equally available to both sides (see generally People v Gonzalez, 68 NY2d 424, 427 [1986]).
Finally, we reject defendant's argument that the sentence imposed was harsh and excessive. The mere fact that the sentence imposed after trial was greater than the sentence offered during plea negotiations does not support an inference that defendant was penalized for exercising his right to trial (see People v Baber, 182 AD3d 794, 802-803 [2020], lv denied 35 NY3d 1064 [2020]; People v Zi He Wu, 161 AD3d 1396, 1398 [2018], lv denied 32 NY3d 943 [2018]). Although defendant had no prior criminal history and expressed remorse for his conduct, in light of the serious nature of the crimes while the victim was attempting to retreat, we discern no abuse of discretion or extraordinary circumstances that would justify a reduction of the sentence in the interest of justice (see People v Meadows, 180 AD3d at 1249; People v Porter, 168 AD3d 1283, 1284 [2019], lv denied 33 NY3d 1034 [2019]; People v Guzy, 167 AD3d 1230, 1238 [2018], lv denied 33 NY3d 948 [2019]).
Garry, P.J., Clark, Pritzker and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: As with any attempt crime, the People were required to prove that defendant's conduct "came 'dangerously near' commission of the completed crime" (People v Kassebaum, 95 NY2d 611, 618 [2001], cert denied 532 US 1069 [2001]).