People v Bowes (2022 NY Slip Op 03940)

People v Bowes

2022 NY Slip Op 03940

Decided on June 16, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 16, 2022

111217
[*1]The People of the State of New York, Respondent,
v
James T. Bowes, Appellant.

Calendar Date:April 26, 2022

Before:Egan Jr., J.P., Lynch, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Dennis J. Lamb, Troy, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Nathan M. Bloom of counsel), for respondent.

Lynch, J.
Appeal from a judgment of the County Court of Chemung County (Rich Jr., J.), rendered March 1, 2019, upon a verdict convicting defendant of the crimes of criminal possession of a controlled substance in the second degree and unlawful manufacture of methamphetamine in the third degree.
In May 2018, defendant and Albert Dunkle were walking on a trail in Chemung County that was known as a location where individuals would discard the remnants of materials used to make methamphetamine. Two police officers who were patrolling the area observed Dunkle "cradling" a plastic bag in his arms that was similar to the ones previously found in that location. Upon inquiry, Dunkle informed the police that the bag contained a one-liter soda bottle, a container known to be used for manufacturing methamphetamine through the one-pot cooking method.[FN1] Upon observing a white/blue substance inside the bottle, the officers placed defendant and Dunkle under arrest. The bottle was later tested and found to contain over two ounces of methamphetamine.
Thereafter, defendant was charged by indictment with criminal possession of a controlled substance in the second degree and unlawful manufacture of methamphetamine in the third degree. Following a combined Mapp/Huntley hearing, County Court denied defendant's motion to suppress his statements to law enforcement as the product of an illegal stop. A jury trial ensued, after which defendant was convicted as charged. He was sentenced to concurrent prison terms of six years on the criminal possession conviction, to be followed by five years of postrelease supervision, and one year on the unlawful manufacture of methamphetamine conviction. Defendant appeals.
Defendant contends that the verdict is legally insufficient and against the weight of the evidence, maintaining that the People's proof did not support convictions on the charges upon a theory of accessorial liability. As relevant here, "[a] person is guilty of criminal possession of a controlled substance in the second degree when he or she knowingly and unlawfully possesses . . . one or more preparations, compounds, mixtures or substances containing methamphetamine, its salts, isomers or salts of isomers . . . [with] an aggregate weight of two ounces or more" (Penal Law § 220.18 [2]). "A person is guilty of unlawful manufacture of methamphetamine in the third degree when he or she possesses at the same time and location, with intent to use, or knowing that another intends to use each such product to unlawfully manufacture, prepare or produce methamphetamine . . . [a] precursor . . . mixed together with a chemical reagent or solvent" (Penal Law § 220.73 [3] [a]).
In New York, "there is no legal distinction between criminal liability as a principal or as an accessory" to a crime (People v Spencer, 169 AD3d 1268, 1272 [2019], lvs denied 34 NY3d 935, 938 [2019]). Accordingly, the People may proceed upon a theory of accomplice liability to hold a defendant culpable [*2]for the acts of another "when [he or she], acting with the mental culpability required for the commission thereof, . . . solicits, requests, commands, importunes or intentionally aids such person to engage in such conduct" (Penal Law § 20.00).
At trial, Patrick Pirozzolo, a deputy with the Chemung County Sheriff's Office, testified that, on the evening of May 17, 2018, he was patrolling a section of the Catherine Valley Trail in Chemung County where "several methamphetamine dumpsites" had been located in the preceding weeks. Pirozzolo, who was trained in identifying one-pot methamphetamine labs, noted that the dumpsites generally consisted of one-liter soda bottles kept in plastic bags, which contained a "white-ish substance" consisting of methamphetamine residue. At approximately 7:11 p.m. on that date, while it was still light out, Pirozzolo observed "two males walking south" on the trail, one of whom was "cradling a . . . plastic bag like the one from the meth sites." Pirozzolo recalled that, when the two men saw his marked patrol vehicle, they "began to pick up their pace."
Pirozzolo and Chris Hamula, another officer who was present at the time, then proceeded to a street farther down from where they had previously been stationed in an "attempt to cut the[ men] off and do a field interview." Upon encountering the men again, Pirozzolo "yelled over" to them, but they started walking away. Pirozzolo gave the men another verbal command to come over and Dunkle — who was carrying the plastic bag — stopped and turned back to speak with Pirozzolo, but defendant initially continued walking. According to Pirozzolo, when defendant realized that Dunkle had turned around, he also turned back and "got in front of Dunkle . . . almost in an attempt to
. . . keep [him] away." Pirozzolo observed that defendant's carotid artery was visibly pulsating and he was "shaking" and "[s]weating profusely." When Pirozzolo asked what was in the plastic bag, Dunkle held it up, stated that it was soda and exposed a one-liter bottle. Pirozzolo testified that he immediately knew that the substance in the bottle was not soda, emphasizing that it was "a blue-ish white . . . substance, which is common with a one-pot meth lab." Pirozzolo explained that Dunkle tried to hand the bag to him, but he immediately pushed it away, noting that an "active methamphetamine dumpsite" can explode. Defendant and Dunkle were then placed under arrest. Officer Hamula corroborated Pirozzolo's testimony about defendant's and Dunkle's initial reactions upon noticing Pirozzolo's marked patrol vehicle and defendant's physical manifestations upon being confronted.
The People also elicited testimony from Alex Krawczyk, a state trooper trained in the mechanics of methamphetamine production. Upon arriving at the scene to process the physical evidence, Krawczyk observed a yellow plastic bag that contained a one-liter bottle. At trial, Krawcyzk explained the process of manufacturing methamphetamine [*3]using the one-pot method, noting that a solvent, such as Coleman fuel, is placed inside of a vessel — usually a plastic or glass bottle — and then sodium hydroxide, pseudoephedrine and lithium are added to form "meth oil," which is then strained and processed into usable methamphetamine. He testified that the bottle recovered from the scene appeared to have pseudoephedrine, ammonium nitrate and lithium in it, and to be in the process of forming meth oil.
The People also presented testimony from Nicholas DeMuth, a lieutenant investigator who interviewed defendant at the police station. DeMuth testified that defendant initially stated that he had "no idea why he was stopped by deputies that day" and "no idea about a meth lab." DeMuth noted, however, that when he confronted defendant about information obtained from a police database demonstrating that defendant previously purchased pseudoephedrine, defendant responded that he does so "on a regular basis" and had previously provided some to Dunkle "for the purpose of cooking methamphetamine." DeMuth confirmed that methamphetamine cannot be made without such precursor. Moreover, the People presented evidence that the bottle recovered from the scene contained 58.9 grams of methamphetamine, which is a little over two ounces.
Defendant testified that Dunkle was an "[a]cquaintance" and, on the date in question, he was performing construction work at the home of Dunkle's parents, which was close to the trail where he and Dunkle were eventually stopped by police. According to defendant, Dunkle left the residence after defendant began working and returned around 6:45 p.m. Dunkle then approached and asked defendant if he wanted to "take a break and walk with him to the store to buy a pack of cigarettes." Prior to departing, Dunkle grabbed some food and a drink, but defendant did not see what Dunkle put in the plastic bag. Defendant maintained that, when he and Dunkle were stopped by the police, he "immediately walked . . . right to the cops" while Dunkle "lagged behind." Defendant averred that he had no idea that Dunkle was carrying a one-pot methamphetamine lab and had never seen one. On cross-examination, defendant conceded that he told DeMuth that, on a prior occasion, he bought a box of Sudafed, but maintained that he did so to exchange it for half a gram of methamphetamine from Dunkle. He clarified that he did not provide Dunkle with Sudafed on the day of their arrest and was adamant that he did not know that Dunkle was making methamphetamine, emphasizing that, when Dunkle had given him the drug in the past, it was in powder form.
On this record, the proof is sufficient to hold defendant liable for both charges upon a theory of accessorial liability (see People v Moreno, 58 AD3d 516, 517 [2009], lv denied 12 NY3d 819 [2009]). As for the criminal possession charge, the People presented conclusive proof that Dunkle physically possessed a one-pot methamphetamine lab containing more than two [*4]ounces of the substance (see Penal Law § 220.18 [2]). As for defendant's liability, although a person's "mere presence at the scene of the crime is, standing alone, insufficient to support a finding of criminal liability" (People v Spencer, 152 AD3d 863, 866 [2017], lv denied 30 NY3d 983 [2017] [internal quotation marks and citations omitted]), the verdict is not based solely upon defendant's presence next to Dunkle. Rather, there was direct testimony that defendant was extremely nervous upon encountering police and attempted to step in front of Dunkle as if to prevent him from making contact with Pirozzolo. Such evidence, together with the testimony that the men were found walking on a trail that was a known methamphetamine dumpsite, Dunkle was cradling a plastic bag in a suspicious manner and defendant told DeMuth that he regularly purchased pseudoephedrine and had previously provided some to Dunkle "for the purpose of cooking methamphetamine," could lead the jury to rationally conclude that defendant knew that Dunkle possessed methamphetamine at the time of the encounter and provided the pseudoephedrine necessary to produce it, thereby "intentionally aid[ing] him" in the possession (Penal Law § 20.00; see People v Dean, 200 AD2d 582, 583 [1994], lv denied 83 NY2d 871 [1994]). That same evidence of defendant's demeanor upon encountering police and his inculpatory statements to DeMuth, along with the proof that the bottle contained a precursor mixed together with a chemical reagent or solvent and that Dunkle possessed methamphetamine in a type of vessel used to manufacture the drug, also supports a finding of liability as an accomplice on the unlawful manufacture charge (see Penal Law § 220.73 [3] [a]).[FN2] Accordingly, we conclude that the verdict against defendant upon a theory of accessorial liability is founded upon legally sufficient evidence and is not against the weight of the evidence.[FN3]
Next, County Court did not err by permitting the People to elicit testimony about inculpatory statements defendant made to DeMuth even though the People's CPL 710.30 notice erroneously stated that he made such statements to Pirozzolo. "CPL 710.30 requires that the People serve upon a defendant, within 15 days after arraignment, notice of their intention to offer at trial evidence of statements made by the defendant to public servants" (People v O'Doherty, 70 NY2d 479, 483 [1987]). The purpose of the statute "is to inform a defendant that the People intend to offer evidence of a statement to a public officer at trial so that a timely motion to suppress the evidence may be made" (People v Murphy, 101 AD3d 1177, 1177 [2012]; see People v Lopez, 84 NY2d 425, 428 [1994]).
Although the CPL 710.30 notice erroneously listed Pirozzolo, the notice correctly outlined the substance of the statements and a suppression hearing was ultimately held as to their admissibility upon defendant's motion, during which it was revealed that they were actually uttered to DeMuth [*5](see CPL 710.30 [3]; People v Davis, 144 AD3d 1188, 1189 [2016], lvs denied 28 NY3d 1144, 1150 [2017]). In these circumstances, "[t]he incorrect name of the officer who conducted the interview did not change the substance of the notice or the ability of defense counsel to make a timely motion for a [suppression] hearing" (People v Dagett, 150 AD3d 1680, 1683 [2017], lv denied 29 NY3d 1125 [2017]). As such, County Court did not err in permitting DeMuth to testify as to defendant's inculpatory statements at the police station despite the mistake in the notice.
Nor did County Court err in denying defendant's motion to suppress his inculpatory statements to DeMuth as the product of an illegal police stop. Law enforcement may engage in "[t]he minimal intrusion of approaching [an individual] to request information . . . when there is some objective credible reason for that interference not necessarily indicative of criminality" (People v De Bour, 40 NY2d 210, 223 [1976]). The next level of intrusion — i.e., the common law right to inquire — "is activated by a founded suspicion that criminal activity is afoot and permits a . . . police [officer] . . . to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure" (id.). A police officer may forcibly stop and detain an individual upon "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (id.). Finally, an arrest may be made where the officer "has probable cause to believe [a] person has committed a crime" (id.). "A suppression court's factual determinations are entitled to great weight" (People v Lowndes, 167 AD3d 1228, 1229 [2018] [internal quotation marks and citations omitted]), and generally will not be disturbed "absent a basis in the record for finding that the court's resolution of credibility issues was clearly erroneous" (People v Rudolph, 170 AD3d 1258, 1259 [2019], lv denied 34 NY3d 937 [2019]).
The testimony at the suppression hearing regarding the circumstances precipitating the police encounter was largely consistent with the testimony proffered at trial on this issue. Police had an objective and credible reason for approaching defendant and Dunkle after observing them walking on a trail that was known as a methamphetamine dumping site with Dunkle "cradling" a plastic bag and seeing the men speed up upon noticing Pirozzolo's marked patrol vehicle (see People v Hollman, 79 NY2d 181, 191 [1992]; People v Jones, 156 AD3d 960, 961-962 [2017], lv denied 30 NY3d 1116 [2018]; People v Rosario, 27 AD3d 254, 255-256 [2006], lv denied 7 NY3d 762 [2006]). Pirozzolo testified that "cradling" a plastic bag in that manner — i.e., "holding it almost like someone would hold a baby" — was suspicious, particularly given the bags discarded in this area that contained soda bottles used for producing methamphetamine. Considering the surrounding circumstances, we conclude that [*6]Pirozzolo was permitted to inquire about the contents of the bag (see generally People v Hollman, 79 NY2d at 191 ["If (an) individual is carrying something that would appear to a trained police officer to be unusual, the police officer can ask about that object"]; People v Howard, 50 NY2d 583, 589-590 [1980]). Finally, upon observing a "whiteish-blue" substance in plain view within the bottle that Dunkle exposed, there was probable cause to make an arrest (see generally People v Smith, 185 AD3d 1203, 1207 [2020]). Contrary to defendant's contention, the police were justified in arresting both men, as the totality of the circumstances suggested that they were acting in concert (see People v Rosario, 27 AD3d at 256). As the stop and arrest were lawful, County Court properly declined to suppress defendant's statements to DeMuth as the product of an illegal police stop.
Defendant additionally maintains that County Court abused its discretion in fashioning a Sandoval compromise that permitted the People to question him about, among other things, a 2003 conviction for grand larceny in the third degree. "A defendant who chooses to testify may be questioned about a prior conviction pertinent to the issue of credibility" (People v Cole, 177 AD3d 1096, 1100 [2019], lv denied 34 NY3d 1015 [2019]; see People v Sandoval, 34 NY2d 371, 376 [1974]). Trial courts "have broad discretion 'as to which prior convictions . . . can be inquired about and the extent of such inquiry'" (People v Cole, 177 AD3d at 1100, quoting People v Adams, 39 AD3d 1081, 1082 [2007], lv denied 9 NY3d 872 [2007]). In fashioning a Sandoval compromise, the trial court must balance the probative value of the prior conviction against the potential for undue prejudice (see People v Sandoval, 34 NY2d at 375; People v Fogarty, 12 AD3d 854, 856 [2004], lv denied 4 NY3d 763 [2005]). Although there is "no bright line or per se rule requiring preclusion of a prior conviction based on the age or remoteness of the conviction[,] . . . remoteness is a factor to be considered in the balancing process under Sandoval [insofar as] that 'lapse of time will affect the materiality if not the relevance of previous conduct'" (People v Cole, 177 AD3d at 1100 [internal citation and ellipsis omitted], quoting People v Sandoval, 34 NY2d at 376).
Prior to trial, the People indicated their intent to question defendant, should he choose to testify, about three prior convictions: (1) a 2014 conviction for criminal sale of a controlled substance in the third degree, for which he received a prison sentence of four years; (2) a 2012 misdemeanor conviction for driving while ability impaired, for which he received a term of probation; and, (3) a 2003 conviction for grand larceny in the third degree, for which he was sentenced to an indeterminate prison term of one to three years.[FN4] County Court permitted the People to question defendant about the 2014 conviction to the extent of generically asking him if he was "convicted [*7]of a felony in 2014 and sentenced to a prison term" of four years. If defendant answered in the affirmative, questioning was to cease without any reference to the nature of the conviction or the underlying facts; such information could be explored, however, if defendant answered in the negative. The court fashioned the same compromise as it related to the 2012 misdemeanor conviction. As for the 2003 conviction, the court concluded that it was probative of defendant's credibility because it "clearly shows putting one[']s own interests above society" and permitted the People to ask defendant if he was convicted of grand larceny in the third degree in 2003, without reference to the underlying facts.
We recognize that the 2003 conviction was over 15 years old by the time defendant testified. Nevertheless, the conviction was for a crime of theft and, thus, was probative of defendant's credibility (see People v Taylor, 140 AD3d 1738, 1739 [2016] [holding that a court did not abuse its discretion by permitting the People to question a defendant about prior drug convictions that were 15 years old or more insofar as they bore on his credibility]; People v Trichilo, 230 AD2d 926, 928 [1996], lv denied 89 NY2d 931 [1996] [rejecting the proposition that "the nearly 15-year-old conviction" of burglary in the second degree was too remote in time insofar as it "concern(ed) thievery" and was therefore relevant to the defendant's credibility]). Moreover, the 2003 conviction was "so dissimilar to the charged crime[s] that it had little potential for unfair prejudice" (People v Hunter, 55 AD3d 1052, 1054 [2008], lv denied 11 NY3d 898 [2008]; see People v Victor, 139 AD3d 1102, 1110 [2016], lv denied 28 NY3d 1076 [2016]). County Court further limited the prejudice by precluding questioning about the underlying facts of the conviction. In these circumstances, we conclude that the 2003 conviction was not so remote as to diminish its probative value and County Court did not abuse its discretion in allowing the People to ask defendant about it in the event he testified at trial.[FN5]
We further reject defendant's contention that the uniform sentence and commitment form improperly imposed a $50 DNA fee and a $25 crime victim assistance fee that were not pronounced by County Court during the sentencing hearing. Such fees are mandated by statute (see Penal Law § 60.35 [1] [a] [v]) and "are not components of a defendant's sentence" (People v Hoti, 12 NY3d 742, 743 [2009]; see Penal Law § 60.35 [1] [a]). Accordingly, County Court was not required to pronounce these fees during the sentencing hearing for them to be properly levied against defendant (see CPL 380.20; 380.40; People v Guerrero, 12 NY3d 45, 46-48 [2009]). Defendant's remaining contentions, to the extent not expressly addressed, have been considered and found lacking in merit.
Egan Jr., J.P., Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: A one-pot methamphetamine lab is "essentially a soda bottle in which all of the necessary ingredients are mixed to cause the chemical reactions required to produce methamphetamine" (People v Maricle, 158 AD3d 984, 987 [2018]).

Footnote 2: Defendant contends that, because the weight of the evidence does not support a theory of accessorial liability, it was reversible error for County Court to charge the jury as such. County Court originally decided that it was not going to give this charge but then changed course as the charge conference progressed. Defense counsel did not object upon being informed that the court was going to give the charge and, thus, defendant's argument is unpreserved (see People v Avery, 80 AD3d 982, 983 [2011], lv denied 17 NY3d 791 [2011]).

Footnote 3: The record makes clear that Pirozzolo and Hamula were wearing functioning body cameras at the time of the encounter but the footage was not preserved because they failed to request it within the time frame required by the Chemung County Sheriff's Office. Such footage would have been relevant to assessing the credibility of their testimony as it pertained to defendant's demeanor upon encountering police. Nevertheless, the testimony on the issue was consistent between both witnesses and defense counsel made the jury aware of the failure to preserve such evidence through cross-examination. An adverse inference charge was also given in this respect and there is no indication that the failure to preserve this evidence was intentional. In these circumstances, we conclude that the failure to preserve such evidence does not require reversal or otherwise affect the verdict (see generally People v Haupt, 71 NY2d 929, 931 [1988]).

Footnote 4: Defendant maintained at trial that he was remanded to the Willard drug treatment program on the 2014 conviction and, as such, did not actually serve any prison time. The record is insufficient to confirm this claim.

Footnote 5: We note that the People ultimately did not question defendant about his prior convictions at trial. Rather, defense counsel preemptively questioned him about the prior convictions within the bounds of the Sandoval compromise.