People v Calafell (2022 NY Slip Op 06838)

People v Calafell

2022 NY Slip Op 06838

Decided on December 1, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 1, 2022

112230
[*1]The People of the State of New York, Respondent,
v
Tarell L. Calafell, Appellant.

Calendar Date:October 18, 2022

Before:Garry, P.J., Lynch, Reynolds Fitzgerald, Ceresia and McShan, JJ.

Adam H. Van Buskirk, Auburn, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Nathan M. Bloom of counsel), for respondent.

Reynolds Fitzgerald, J.
Appeal from a judgment of the County Court of Chemung County (Christopher P. Baker, J.), rendered August 19, 2019, upon a verdict convicting defendant of the crimes of attempted assault in the first degree, criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree.
Defendant was charged in an August 2018 indictment with attempted murder in the second degree, attempted assault in the first degree, criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree. The charges stemmed from allegations that on July 26, 2018, as defendant was walking down a street in the City of Elmira, Chemung County he was pursued and shot at by another man. After firing his weapon at defendant, the man fled. In turn, defendant gave chase and fired several shots at him. Neighbors called 911 and police located defendant — who matched the description of one of the suspects in the shooting — a few blocks away. Following a jury trial, defendant was acquitted of attempted murder in the second degree but was convicted of all remaining charges. County Court sentenced defendant, as a second felony offender, to a prison term of 15 years with five years of postrelease supervision on the attempted assault conviction and to equal or lesser concurrent terms on the remaining convictions. Defendant appeals.
Defendant challenges the verdict as unsupported by legally sufficient evidence and against the weight of the evidence, arguing both that the People failed to establish his identity as the shooter beyond a reasonable doubt and that they failed to prove that he had the requisite intent to commit the crime of attempted assault in the first degree. "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Warner, 194 AD3d 1098, 1099 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 1030 [2021]; see People v Terry, 196 AD3d 840, 841 [3d Dept 2021], lv denied 37 NY3d 1030 [2021]). "To determine whether a verdict is against the weight of the evidence, this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of the conflicting inferences that may be drawn from the testimony" (People v Serrano, 200 AD3d 1340, 1342 [3d Dept 2021] [internal quotation marks and citations omitted], affd 38 NY3d 1180 [2022]; People v Barzee, 190 AD3d 1016, 1017-1018 [3d Dept 2021], lv denied 36 NY3d 1094 [2021]).
As [*2]relevant here, a conviction for attempted assault in the first degree requires proof that the defendant acted with the intent to cause serious physical injury to another person (see Penal Law §§ 110.00, 120.10 [1]). "Criminal intent may be inferred from the totality of the circumstances or from the natural and probable consequences of the defendant's conduct" (People v Conway, 179 AD3d 1218, 1219 [3d Dept 2020] [internal quotation marks, ellipsis, brackets and citations omitted], lv denied 35 NY3d 941 [2020]; see People v Pine, 126 AD3d 1112, 1114 [3d Dept 2015], lv denied 27 NY3d 1004 [2016]). As relevant to count 3 of the indictment, "[a] person is guilty of criminal possession of a weapon in the second degree when[,] . . . with intent to use the same unlawfully against another, such person
. . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]). Pursuant to Penal Law § 265.03 (3), in order to find a person guilty of criminal possession of a weapon in the second degree (count 4), the People must establish that he or she possessed a loaded firearm outside of his or her home or place of business. For a conviction of criminal possession of a weapon in the third degree, the People must prove that the defendant, having previously been convicted of a crime, committed the offense of criminal possession of a weapon in the fourth degree (see Penal Law § 265.02 [1]), which requires, as relevant here, proof that defendant knowingly possessed a firearm (see Penal Law § 265.01 [1]).
At trial, an individual who lived on the street where the shooting took place testified that he heard an initial gunshot, and then, after a short period, he heard another set of gunshots. He looked out his window and saw a tall, skinny, dark male wearing dark clothing running down the street. Simultaneously, he saw another individual, whom he described as a little bit stockier and wearing a white tank top, take several steps toward the fleeing person, raise a semi-automatic firearm at the individual who was running away, fire the weapon three to five times and then run off in the opposite direction. A second eyewitness testified similarly, adding that he had subsequently discovered a bullet hole in the wall of his house. Video footage from a security camera located at a house on the street where the shooting occurred corroborated the eyewitness accounts of the shooting.
A police officer with the Elmira Police Department (hereinafter EPD), testified that he was responding to a call for shots fired when information relayed over the radio indicated a subject wearing blue jeans and a white tank top was running toward him. When the officer saw defendant, who matched this description, he stopped and detained him until another officer could handcuff him. A second police officer — an evidence technician with the EPD — testified that he was dispatched to the scene and collected a water bottle, a cell phone, four 9 millimeter shell casings, a Springfield Armory XD 9 millimeter [*3]semi-automatic pistol and a projectile located in the wall of a home near where the incident allegedly happened. An investigator and firearms instructor with the EPD testified that he interviewed defendant. He confirmed that defendant was wearing blue jeans and a white tank top and that he obtained a DNA sample from defendant. The investigator further testified that he test-fired the pistol found at the scene of the shooting — the Springfield Armory XD 9 millimeter — and deemed the gun operable. Additionally, he testified that both a bullet and a separate bullet hole were found in the house next to where defendant fell down and that the evidence demonstrated that these both came from the direction where the other subject was standing. The investigator also explained that shell casings are automatically ejected from a semi-automatic firearm when the firearm is shot, whereas casings from a revolver remain inside of the firearm. Based on this ballistic evidence, it was evident that two weapons were used in the shooting.
A forensic scientist firearm examiner at the State Police forensic investigation center corroborated this finding. She averred that she examined the gun, magazine, shell casings and projectiles found at or near the scene of the shooting. She stated that, after examination and testing, it was her finding that the bullet that was pulled from the wall of a house was in the same class and had the same class characteristics as the Springfield pistol, but that she could not state definitively that it had come from the gun in question. She could, however, identify the casings found at the scene as coming from that specific gun. Finally, she identified the other bullet found in the driveway at the scene as more consistent with a .357 or a .38 caliber bullet. An employee of the State Police forensic investigation center testified that he performed DNA analysis on the water bottle found at the site of the shooting and opined to a reasonable degree of scientific certainty that the DNA profile from the water bottle matched the profile from defendant's DNA sample.
As to the conviction for attempted assault in the first degree, the evidence is legally sufficient to support this conviction. The eyewitnesses and video footage clearly depict defendant standing up after he was shot at, taking several steps in the direction of the then-fleeing man and firing several shots at him. Although the video does not contain any audio, the eyewitnesses testified that they heard shots being fired after defendant stood up and moved toward the fleeing man. Contrary to defendant's contention, his intent can be readily inferred from his conduct in taking several steps toward and shooting at the fleeing man "from a relatively short distance while the [other subject] was in the process of retreating" (People v Warner, 194 AD3d 1098, 1104 [3d Dept 2021], lv denied 37 NY3d 1030 [2021]). When "[v]iewed in the light most favorable to the People, we find that this evidence [*4]presented a valid line of reasoning and permissible inferences from which a rational juror could conclude that defendant committed the crime of attempted assault by intending to cause serious physical injury" with the use of a deadly instrument (People v LaDuke, 204 AD3d 1083, 1086-1087 [3d Dept 2022], lv denied 38 NY3d 1072 [2022]; see People v Coleman, 151 AD3d 1385, 1387 [3d Dept 2017], lv denied 29 NY3d 1125 [2017]). Although a different verdict would not have been unreasonable given the lack of direct evidence that defendant possessed or shot the gun, viewing the record evidence in a neutral light and according deference to the jury's credibility determinations, we find the verdict is supported by the weight of the evidence (see People v Daniels, 174 AD3d 955, 957 [3d Dept 2019], lv dismissed 34 NY3d 950 [2019]; People v Gill, 168 AD3d 1140, 1142 [3d Dept 2019]).
Turning to the weapon possession convictions, eyewitness testimony, which was corroborated by the video footage, depicts a man in a white tank top on the street shooting a weapon at another individual, after that individual had shot at him. The evidence adduced from the bullets and shell casings found at or near the scene of the shooting demonstrates that, contrary to defendant's contentions, the People proved that two weapons were involved. "Viewing this evidence in the light most favorable to the People, we conclude that there is a valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the fact finder on the weapon possession counts" (People v Gilmore, 200 AD3d 1184, 1188-1189 [3d Dept 2021] [internal quotation marks, brackets and citations omitted], lv denied 38 NY3d 927 [2022]; see People v Terry, 196 AD3d at 845; People v Solomon, 78 AD3d 1426, 1428 [3d Dept 2010], lv denied 16 NY3d 899 [2011]). As to the weight of the evidence, a different verdict would not have been unreasonable since there was no DNA evidence obtained from the pistol, but given the eyewitness statements, the security footage, the bullets and shell casings, we are satisfied that the verdict on the weapon possession counts is not against the weight of the evidence (see People v Gilmore, 200 AD3d at 1189; People v Young, 190 AD3d 1087,1092 [3d Dept 2021], lv denied 36 NY3d 1102 [2021]; People v Shoga, 89 AD3d 1225, 1227-1228 [3d Dept 2011], lv denied 18 NY3d 886 [2012]).
We reject defendant's contention that the People should have instructed the grand jury on the defenses of justification and temporary and lawful possession. "Where the evidence suggests that a complete defense such as justification may be present, the prosecutor must also charge the grand jurors on that defense, providing enough information to enable them to determine whether the defense, in light of the evidence, should preclude the criminal prosecution" (People v Waddell, 78 AD3d 1325, 1326 [3d Dept 2010] [internal quotation marks, brackets and citations omitted], lv denied 16 NY3d [*5]837 [2011]). The defense of "[t]emporary and lawful possession may be established where there is a legal excuse for having the weapon as well as facts tending to establish that, once possession has been obtained, the weapon has not been used in a dangerous manner" (People v Curry, 85 AD3d 1209, 1211 [3d Dept 2011] [internal quotation marks, ellipsis, brackets and citation omitted], lv denied 17 NY3d 815 [2011]; see People v Williams, 36 NY3d 156, 161 [2020]). Given that the grand jury viewed the video footage and heard the eyewitness accounts of defendant getting up off the ground, moving toward and shooting at the retreating subject, "there was no rational view of the evidence at the hearing before [the grand jury] that would support the viability of such [defenses]" (People v Zupan, 184 AD2d 888, 891 [3d Dept 1992], lv denied 80 NY2d 978 [1992]). Accordingly, the People were not required to instruct the grand jury regarding the defenses of justification or temporary and lawful possession (cf. People v Mujahid, 45 AD3d 1184, 1186 [3d Dept 2007], lv denied 10 NY3d 814 [2008]).
Defendant next contends that County Court erred in denying his motion to suppress his statements, as police lacked probable cause to arrest him. "[A]n arrest may be made where the officer has probable cause to believe a person has committed a crime. A suppression court's factual determinations are entitled to great weight, and generally will not be disturbed absent a basis in the record for finding that the court's resolution of credibility issues was clearly erroneous" (People v Bowes, 206 AD3d 1260, 1265-1266 [3d Dept 2022] [internal quotation marks, brackets and citations omitted]).
The testimony at the suppression hearing was largely consistent with the testimony proffered at trial. The record reflects that numerous eyewitnesses provided details of the shooting and descriptions of the two subjects involved in the shooting. The descriptions of the subjects were relayed to police via radio transmission. Shortly thereafter, an officer saw defendant, who fit the description of one of the suspects,[FN1] running approximately two to three blocks from the shooting.[FN2] Additionally, defendant did not immediately stop when directed. Under these circumstances, we agree with County Court that police had a founded suspicion that criminal activity was afoot and were entitled to interfere with defendant by drawing a weapon and handcuffing him, to assure their safety and to the extent necessary to gain explanatory information (see People v Mabeus, 68 AD3d 1557, 1561 [3d Dept 2009], lv denied 14 NY3d 842 [2010]; People v Lewis, 277 AD2d 603, 605 [3d Dept 2000], lv denied 95 NY2d 966 [2000]). Although at the time of the arrest an eyewitness at the scene could not identify defendant as one of the perpetrators, defendant volunteered information that he was involved in the shooting. This, along with eyewitness accounts that there were two shooters, "provided officers with knowledge of facts and [*6]circumstances sufficient to support a reasonable belief that an offense had been committed and that defendant was [one of] the perpetrator[s]," thus providing probable cause to place defendant under arrest (People v Smith, 185 AD3d 1203, 1207 [3d Dept 2020] [internal quotation marks, brackets, ellipsis and citations omitted]). "According deference to County Court's assessment that the suppression hearing testimony and evidence submitted by the People were in all respects credible, we agree with the court that defendant's . . . detention and arrest were proper" (People v Williams, 184 AD3d 1010, 1011 [3d Dept 2020] [internal citations omitted], lv denied 35 NY3d 1097 [2020]; see People v Bowes, 206 AD3d at 1266; People v Smith, 185 AD3d at 1207). Finally, with respect to defendant's contention that his DNA sample should have been suppressed, we note that defendant tendered this evidence voluntarily and, as such, his motion to suppress same was properly denied (see People v Graham, 153 AD3d 1634, 1635 [4th Dept 2017], lv denied 30 NY3d 1060 [2017]; People v Dail, 69 AD3d 873, 874 [2d Dept 2010], lv denied 14 NY3d 839 [2010]; see generally People v Welch, 137 AD3d 1313, 1314 [3d Dept 2016], lv denied 27 NY3d 1141 [2016]).
Defendant's claim that he was deprived of the effective assistance of counsel is without merit. "In order to sustain a claim of ineffective assistance of counsel, a court must consider whether defense counsel's actions at trial constituted egregious and prejudicial error such that the defendant did not receive a fair trial. A claim will fail so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Smith, 193 AD3d 1260, 1267 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 968 [2021]; People v Bombard, 187 AD3d 1417, 1419-1420 [3d Dept 2020]). Here, defendant asserts that his trial attorney failed to argue the defense of justification and failed to vigorously pursue suppressing his statements. "However, as discussed above, these arguments lack merit, and counsel's failure to make a motion or argument that has little or no chance of success does not constitute the ineffective assistance of counsel" (People v Meadows, 183 AD3d 1016, 1023 [3d Dept 2020] [internal quotation marks, brackets and citations omitted], lv denied 35 NY3d 1047 [2020]; see People v Santiago, 185 AD3d 1151, 1156 [3d Dept 2020], lv denied 35 NY3d 1097 [2020]). "Viewing the record as a whole and considering that defendant was acquitted of the charge of attempted murder in the second degree, we are satisfied that defendant received meaningful representation" (People v Turner, 172 AD3d 1768, 1772 [3d Dept 2019] [citations omitted], lv denied 34 NY3d 939 [2019]; see People v Perez, 183 AD3d 934, 937 [3d Dept 2020], affd 36 NY3d 1093 [2021]).
Next, we reject defendant's challenge to [*7]the severity of his sentence as harsh and excessive. Considering defendant's extensive criminal history, the violent and serious nature of the crimes — especially in light of the fact that the shooting took place during the day in a residential area and that bullets did indeed hit two homes in the area — we decline to disturb the sentence (see People v Peasley, 208 AD3d 1466, 1472-1473 [3d Dept 2022]; People v Pointer, 206 AD3d 1232, 1236 [3d Dept 2022], lv denied 38 NY3d 1152 [2022]; People v Dickinson, 182 AD3d 783, 791 [3d Dept 2020], lv denied 35 NY3d 1065 [2020]).
Finally, defendant's pro se supplemental brief, asserting a Brady violation for failing to turn over residue testing of his clothing, "involves allegations that fall outside the record [and, as such], said claim is more appropriately the subject of a CPL article 440 motion" (People v Rodriguez, 195 AD3d 1237, 1242 [3d Dept 2021], lv denied 37 NY3d 1061 [2021]; see People v Morton, 173 AD3d 1445, 1446 [3d Dept 2019], lv denied 34 NY3d 935 [2019]; People v Brown, 139 AD3d 1178, 1179 [3d Dept 2016]).
Garry, P.J., Lynch, Ceresia and McShan, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: The suspect was described as stockier and wearing a white tank top and blue jeans.

Footnote 2: The officer described defendant as having appeared to have been involved in a labored run.