People v Gaylord (2024 NY Slip Op 01131)

People v Gaylord

2024 NY Slip Op 01131

Decided on February 29, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 29, 2024

113496
[*1]The People of the State of New York, Respondent,
v
Nathaniel H. Gaylord, Appellant.

Calendar Date:January 17, 2024

Before:Aarons, J.P., Pritzker, Lynch, Fisher and Mackey, JJ.

Karen G. Leslie, Riverhead, for appellant.
Kirk O. Martin, District Attorney, Owego (Cheryl Mancini of counsel), for respondent.

Pritzker, J.
Appeal from a judgment of the County Court of Tioga County (Gerald A. Keene, J.), rendered October 22, 2021, upon a verdict convicting defendant of the crimes of menacing a police officer (two counts) and menacing in the second degree.
Defendant was charged by indictment with two counts of attempted aggravated assault upon a police officer, two counts of menacing a police officer, one count of menacing in the second degree and one count of discharging a firearm within 500 feet from a dwelling following an incident that occurred in the Town of Newark Valley, Tioga County. The charges stemmed from a July 2020 incident during which defendant, among other things, fired a shotgun near his parents' house and, after police responded, brandished the shotgun while yelling for the officers to shoot him. After a jury trial, defendant was convicted of two counts of menacing a police officer and one count of menacing in the second degree and acquitted of the two counts of attempted aggravated assault upon a police officer.[FN1] Defendant was sentenced to concurrent prison terms of six years, to be followed by three years of postrelease supervision, on each of the menacing a police officer convictions and to a lesser concurrent term of incarceration on the menacing in the second degree conviction. Defendant appeals.
Defendant asserts that the evidence produced at trial is legally insufficient to prove that he had the requisite intent to menace the police officers and his mother and that, for similar reasons, the verdict is against the weight of the evidence. To establish menacing a police officer as charged in the indictment, the People were required to prove that defendant "intentionally place[d] or attempt[ed] to place a police officer . . . in reasonable fear of physical injury, serious physical injury or death by displaying a . . . shotgun, . . . whether operable or not, where such officer was in the course of performing his or her official duties and the defendant knew or reasonably should have known that such victim was a police officer" (Penal Law § 120.18). Additionally, to establish menacing in the second degree as charged in the indictment, the People were required to prove that defendant "intentionally place[d] or attempt[ed] to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon [or] dangerous instrument" (Penal Law § 120.14 [1]). "Intent may be inferred from the defendant's conduct and the surrounding circumstances" (People v Stines, 212 AD3d 883, 885 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1113 [2023]; see People v Pine, 126 AD3d 1112, 1114 [3d Dept 2015], lv denied 27 NY3d 1004 [2016]). "However, inasmuch as evidence of mental illness may negate a specific intent necessary to establish guilt, it is possible for an individual to present evidence at trial that he or she was mentally ill at the time of the incident and, thus, did not possess [*2]the requisite intent to commit the crime" (People v Leppanen, 218 AD3d 995, 997 [3d Dept 2023] [internal quotation marks, brackets, ellipsis and citations omitted], lv denied 40 NY3d 1081 [2023]).
The mother testified that, on the day of the incident, she arrived home from work and confronted defendant because he had not completed his assigned chores. Defendant became upset and punched one of her car's windows and then retrieved a shotgun, which he "was swinging around," causing her to call the police. The mother testified that she was "pretty sure he was high on . . . meth." After defendant drove off into a wooded area on a tractor and fired the shotgun once, he returned to the mother's trailer, apologized to her and said that he "just want[ed] to die" and to "please just let [the police] kill me." The mother also testified that she observed defendant place a note on a table in her trailer in which defendant apologized to his father, told him he loved him and that he would "see [him on] the other side." Seven members of law enforcement who responded to the scene testified at trial.[FN2] Their testimony was largely consistent. More than one law enforcement witness testified that, upon their arrival, the mother appeared scared and panicked. Testimony established that, shortly after law enforcement arrived, defendant, who had been in the mother's trailer, came out to the front porch and sat in a chair while holding a shotgun which he first put in his mouth, then held up against his forehead, then put back into his mouth. There was testimony that defendant repeatedly yelled to law enforcement to just shoot him and kill him. Not long thereafter, defendant left the porch and quickly walked toward law enforcement, yelling out to shoot him. Law enforcement backed up from defendant, but he continued to approach them. Defendant then suddenly brought the shotgun up, "put the butt stock into his shoulder" and pointed it directly at Justin Wilt, an investigator with the State Police, and William White, a lieutenant with the Tioga County Sheriff's Department, who was standing behind Wilt. Wilt and White both testified that they thought defendant was going to shoot them. Wilt then fired one shot at defendant, which struck him, and defendant dropped his weapon and fell to the ground. Members of law enforcement immediately began providing medical attention while they awaited the arrival of paramedics.
For his part, defendant called a neighbor who testified that, earlier in the day, defendant was acting "erratic" and that defendant told the neighbor that he had been "drinking all day." Thomas Harding, a clinical psychologist, testified regarding a psychological evaluation he was asked to perform of defendant. According to Harding, at the time of the incident, "[defendant's] mental state was strongly impacted by both cognitive impairments, impairments related to thinking and reasoning and judgment and memory as well as emotional impairments." Harding also found that [*3]defendant was "significantly depressed" and "thought about suicide and his life ending." Additionally, Harding tested defendant's intelligence, finding that his IQ was in the mid-50s — lower than 99 percent of the general population. Harding diagnosed defendant with attention deficit hyperactivity disorder, stimulant use disorder, alcohol use disorder and cannabis use disorder. Ultimately, Harding concluded that "[defendant's] ability to . . . consider a range of possibilities . . . was extremely impaired" and "[h]is decision making was highly compromised." Harding, on cross-examination, confirmed that he did not find defendant to be insane and defendant did not "lack[ ] the ability to understand the nature and consequences of his actions."
Based upon the foregoing, "[v]iewing this evidence in the light most favorable to the People, we conclude that there is a valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the fact finder" (People v Gilmore, 200 AD3d 1184, 1188-1189 [3d Dept 2021] [internal quotation marks, brackets and citations omitted], lv denied 38 NY3d 927 [2022]; see People v Luna, 206 AD3d 1250, 1252 [3d Dept 2022]). As to intent specifically, defendant's intent to menace his mother may be inferred from the circumstances, including waving the shotgun around at his mother, as well as firing the shotgun, after becoming upset that the mother had confronted him about not completing his chores (see People v File, 201 AD3d 1036, 1038 [3d Dept 2022], lv denied 38 NY3d 950 [2022]; People v Shamsuddin, 167 AD3d 1334, 1334-1335 [3d Dept 2018], lv denied 33 NY3d 953 [2019]; People v McCottery, 90 AD3d 1323, 1324 [3d Dept 2014], lv denied 19 NY3d 975 [2012]). As to menacing Wilt and White, defendant's intent to menace may be inferred from the circumstances, including defendant walking toward the officers and pointing his shotgun at them, after having just yelled for the members of law enforcement to shoot and kill him (see id.). "Accepting that a different verdict would have been reasonable, 'upon reviewing the foregoing evidence in a neutral light and deferring to the jury's resolution of credibility issues, we are satisfied that the jury's verdict is in accord with the weight of the
evidence' " (People v Smith, 177 AD3d 1190, 1191 [3d Dept 2019], lv denied 34 NY3d 1163 [2020], quoting People v Oliver, 135 AD3d 1188, 1191 [3d Dept 2016], lv denied 27 NY3d 1003 [2016]).
Defendant contends that he was denied the effective assistance of counsel based primarily on his trial counsel's failure to request a diminished capacity jury charge. "A claim of ineffective assistance of counsel must be supported with proof that the attorney failed to provide meaningful representation and that there were no strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Njoku, 218 AD3d 1047, 1051 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied[*4]___ NY3d ___ [Jan. 24, 2024]; see People v Baldi, 54 NY2d 137, 147 [1981]). "A claim will fail so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Calafell, 211 AD3d 1114, 1120 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 1077 [2023]; accord People v Agan, 207 AD3d 861, 870 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]). As relevant to the menacing charges, the People needed to prove that defendant intended to place the mother, Wilt and White "in reasonable fear of physical injury, serious physical injury or death" by displaying the shotgun (Penal Law §§ 120.14 [1]; 120.18). Also as relevant here, "[a]lthough proof of a mental defect other than insanity may not have acquired the status of a statutory defense, and will not constitute a 'complete' defense in the sense that it would relieve the defendant of responsibility for all his [or her] acts[,] it may in a particular case negate a specific intent necessary to establish guilt" (People v Segal, 54 NY2d 58, 66 [1981] [internal citation omitted]; see People v Westergard, 69 NY2d 642, 644 [1986]).
In light of the overwhelming testimony by nearly every witness that defendant wanted police officers to shoot and kill him, which Harding described as "a preoccupation . . . that he would die or bring about . . . this incident [which] would end in his death," it is highly unlikely that being instructed that defendant's diminished capacity due to his cognitive impairments and inability to control his emotions would have negated the specific intent necessary relative to these charges. In fact, Harding confirmed that defendant knew he was pointing a loaded shotgun at police officers and that he was expecting a response, namely, being shot and killed by police. Defendant points to no specific testimony or opinion by Harding which contradicts that he was capable of forming this specific intent. Similarly, as to the menacing charge relative to the mother, Harding's testimony actually established that defendant was capable of forming the intent to use the shotgun to scare his mother after she became upset with him for not performing his chores, even if just in that moment (see e.g. People v Fisher, 221 AD3d 1355, 1358 [3d Dept 2023], lv denied ___ NY3d ___ [Jan. 24, 2024]; People v Nicholson, 97 AD3d 968, 969 [3d Dept 2012], lv denied 19 NY3d 1104 [2012]). Thus, given that Harding's testimony regarding defendant's "preoccupation" with suicide was more likely to confirm defendant's specific intent necessary to establish guilt rather than negate it, defendant has not sufficiently proven the lack of strategy in trial counsel's alleged failure to request a diminished capacity jury instruction, which more likely than not would have merely reinforced that defendant did, in fact, possess the specific intent [*5]as to the menacing charges (see People v Nicholson, 26 NY3d 813, 831 [2016]; People v Njoku, 218 AD3d at 1052).[FN3] We have reviewed defendant's arguments regarding other alleged failings on the part of counsel and are unpersuaded. "Viewing the record as a whole and considering that defendant was acquitted of [the most serious charges], we are satisfied that defendant received meaningful representation" (People v Turner, 172 AD3d 1768, 1772 [3d Dept 2019], lv denied 34 NY3d 939 [2019]; accord People v Calafell, 211 AD3d at 1120-1121).
Defendant's further assertion, that County Court improperly charged the jury by adding the names of two police officers — Wilt and White — to the indictment with regard to the charges of menacing a police officer, is unpreserved as defendant did not object to this at trial (see People v Morton, 198 AD3d 1176, 1180 [3d Dept 2021], lv denied 37 NY3d 1163 [2022]). Finally, defendant challenges his sentence as harsh and excessive and requests that this Court reduce it in the interest of justice. However, "we discern no compelling justification for granting defendant's request to modify his sentence in the interest of justice" (People v Mercer, 221 AD3d 1259, 1265 [3d Dept 2023]; see CPL 470.15 [6] [b]). Defendant's remaining contentions have been considered and found to be without merit.
Aarons, J.P., Lynch, Fisher and Mackey, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Prior to the start of the trial, the People moved to dismiss the charge of discharging a firearm within 500 feet from a dwelling, which County Court granted.

Footnote 2: Four members of law enforcement testified to being in their uniforms and one testified that he was in plain clothes but wearing a vest that said "state police" across it.

Footnote 3: Although a diminished capacity jury charge may have aided the jury in determining whether Harding's testimony regarding defendant's cognitive impairments and issues managing and controlling his emotions negated the specific intent necessary relative to the counts of attempted aggravated assault upon a police officer, this is of no moment given that, even without the charge to the jury, defendant was acquitted of these counts.