People v Guynup (2024 NY Slip Op 01839)

People v Guynup

2024 NY Slip Op 01839

Decided on April 4, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 4, 2024

112603
[*1]The People of the State of New York, Respondent,
v
Daniel J. Guynup, Appellant.

Calendar Date:February 21, 2024

Before:Clark, J.P., Lynch, Reynolds Fitzgerald, Ceresia and Powers, JJ.

Barrett D. Mack, Albany, for appellant.
G. Scott Walling, Special Prosecutor, Slingerlands, for respondent.

Ceresia, J.
Appeal from a judgment of the County Court of Saratoga County (James A. Murphy III, J.), rendered May 21, 2020, upon a verdict convicting defendant of the crimes of strangulation in the second degree, assault in the third degree, assault in the second degree, criminal possession of a weapon in the fourth degree, menacing in the second degree, criminal mischief in the fourth degree, criminal contempt in the second degree and harassment in the second degree.
Defendant was charged by indictment with various crimes stemming from episodes of domestic violence against the victim that occurred on June 2 and June 6, 2019, as well as an incident where defendant violated an order of protection in favor of the victim on August 18, 2019. Following a jury trial, defendant was convicted of harassment in the second degree pertaining to the June 2 incident; strangulation in the second degree, assault in the second degree, assault in the third degree, criminal possession of a weapon in the fourth degree, menacing in the second degree and criminal mischief in the fourth degree in connection with the June 6 incident; and criminal contempt in the second degree with respect to the August 18 incident. County Court thereafter sentenced defendant to concurrent prison terms of seven years followed by three years of postrelease supervision on the two felony convictions of strangulation in the second degree and assault in the second degree, and to lesser definite jail terms on the remaining convictions.Defendant appeals.
Turning first to defendant's argument that the verdict is against the weight of the evidence, this "challenge . . . requires consideration of the adequacy of the evidence as to each element of the crimes. In undertaking such review, we must first determine whether a contrary result would not be unreasonable . . . before then weighing the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Gentry, 218 AD3d 919, 921 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 40 NY3d 1012 [2023]). We view the evidence in a neutral light and defer to the jury's assessment of witness credibility (see People v Truitt, 213 AD3d 1145, 1147 [3d Dept 2023], lv denied 39 NY3d 1144 [2023]).
The victim testified at trial that she and defendant had known each other since childhood and were in a romantic relationship, living in a duplex townhouse together at the time of the charged crimes. On June 2, 2019, she and defendant got into an argument over text messages they found on each other's phones, and defendant then proceeded to scream at her and push her down onto an air mattress and up against a wall before she was able to leave the apartment. When she later returned, defendant followed her upstairs, hit her, pulled her by the hair, choked her, grabbed her by the ears and shook her, causing her head to strike a wall.
On the night of June 6, 2019, according [*2]to the victim, defendant again became angry over messages he found on the victim's phone. At the time, the victim was sitting on the edge of the bathtub in their shared upstairs bathroom. Defendant yanked her by the hair off the edge of the tub and onto the floor, picked her up, grabbed her head, shook her and slammed her head into a wall. He then threw her down the stairs and choked her. When the victim attempted to leave, defendant grabbed her keys and threw them to the floor, smashing the keychain. Defendant pushed the victim, who was wearing only undergarments, out into the garage and told her she could sleep there for the night. The victim ran out to her car, which was parked just outside of the garage in the driveway, climbed inside and locked the doors. Defendant began banging on the windshield, grabbed a masonry trowel and threatened to slash the tires and break the windows if the victim did not get out of the car. The victim was able to escape and run down the street, but defendant quickly caught her. The next thing the victim could recall was being back in the garage, but she could not remember how she got there. In the garage, defendant attempted to stab the victim with the trowel and threatened to kill her. He then dragged the victim back into the townhouse where he proceeded to repeatedly slam her head into a railing, saying "that hurts, doesn't it," kicked her, choked her to the point of lightheadedness and pushed her face into a mattress so that she could not breathe. Eventually, the altercation subsided, defendant fell asleep, and the victim fled from the townhouse and called 911. She was taken by ambulance to the hospital.
The victim thereafter stopped residing with defendant, blocked his phone number and obtained an order of protection against him. In the early morning hours of August 18, 2019, while she was asleep, a text message was sent to the victim's phone from an unknown number stating, "hey, I miss you." A few minutes later, the victim received a voicemail from defendant's phone number. When the victim listened to it the following morning, she was able to identify defendant's voice on the recording.
In addition to the victim's testimony, the People introduced text messages surreptitiously sent by the victim during the June 2 and June 6, 2019 incidents, wherein she sought help from a friend, as well as videos that she secretly recorded of some of the violence. The People also submitted the victim's medical records and numerous photographs of her injuries sustained on June 6. Hospital staff and members of law enforcement testified about observing injuries that were consistent with the victim's report of the events of that night. There was also police officer testimony indicating that, upon speaking with defendant that night and the next day, he gave evolving accounts of what had occurred — initially denying that anything had happened, then acknowledging a verbal argument, before later admitting to some of the victim's allegations [*3]of physical violence.
For his part, defendant testified that his relationship with the victim was volatile, including multiple breakups. According to defendant, the events on June 2 and June 6, 2019 involved arguments but not the physical violence described by the victim. In his telling, the victim did not flee from him in her underwear on June 6, but instead wanted to go for a walk, and he told her she should not do so in front of the neighbors. Defendant also testified that he had nothing to do with the August 18 text message and described the voicemail as the result of an accidental pocket dial. Upon cross-examination, defendant acknowledged the discrepancies among the different versions of events that he had given to the police.
An acquittal on the crimes of conviction would not have been unreasonable had the jury credited defendant's testimony (see People v Thomas, 215 AD3d 1052, 1053 [3d Dept 2023], lv denied 40 NY3d 931 [2023]). Nevertheless, the jury clearly chose to accept the victim's account over defendant's insofar as it pertained to the eight crimes for which he was found guilty. Viewing the evidence in a neutral light and deferring to the jury's assessment of credibility, the verdict is not against the weight of the evidence (see People v Peasley, 208 AD3d 1466, 1470 [3d Dept 2022], lv denied 39 NY3d 1074 [2023]; People v Walker, 190 AD3d 1102, 1104-1105 [3d Dept 2021], lv denied 37 NY3d 961 [2021]; People v Dixon, 118 AD3d 1188, 1189 [3d Dept 2014]).
We find no merit to defendant's argument that his right to remain silent was violated because he was compelled to testify in response to his various pretrial statements that were admitted into evidence. Defendant has not even argued, let alone demonstrated, that the statements in question were inadmissible. A criminal defendant certainly may determine it to be beneficial to testify in response to evidence presented against him or her, and that is a decision that a defendant alone is entitled to make (see People v White, 73 NY2d 468, 478 [1989], cert denied 493 US 859 [1989]; People v Diaz, 163 AD3d 110, 115 [3d Dept 2018], lv denied 32 NY3d 1110 [2018]). Here, defendant freely exercised this choice, and in no way was his privilege against compulsory self-incrimination violated.
Relatedly, defendant contends that his attorney was ineffective for failing to raise an objection to this Fifth Amendment issue. However, "counsel was not obliged to raise an issue that stood no chance of success" (People v Ballard, 200 AD3d 1476, 1478 [3d Dept 2021], lv denied 38 NY3d 925 [2022]). As for the balance of defendant's ineffective assistance claim, wherein he argues that counsel should have objected to the admission of certain photographs and a map as lacking a proper evidentiary foundation, this argument fails for the same reason. Defendant has not identified any alleged foundational deficiencies and, in any event, the record reveals that there was an adequate foundation for the admission of these [*4]exhibits (see People v Pendell, 164 AD3d 1063, 1069-1070 [3d Dept 2018], affd 33 NY3d 972 [2019]; People v Richardson, 162 AD3d 1328, 1330 [3d Dept 2018], lv denied 32 NY3d 1128 [2018]). Viewing the record as a whole — and noting that defendant was acquitted of three charges, including two of the four felonies with which he was charged — we are satisfied that he received meaningful representation (see People v Calafell, 211 AD3d 1114, 1120-1121 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]; People v Machia, 206 AD3d 1272, 1278 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]).
Finally, we are unmoved by defendant's claim that his sentence is harsh and excessive. To begin with, defendant's conduct was abhorrent, particularly that which occurred on June 6, 2019, when defendant engaged in a prolonged, violent attack on the victim over the course of three hours. His actions had a significant impact upon the victim, as evidenced by her statement at the time of sentence. Additionally, defendant's superficial acceptance of responsibility at sentencing was belied by his statements during the presentence interview. That is, while defendant admitted to some of the more minor allegations against him, such as breaking the keychain and making threats, he denied much of the most serious behavior and, indeed, tried to blame the victim, stating that she had made "crazy" allegations to "get back at [him]" and that he did not want to go to prison for something he did not do. Under these circumstances, and considering that defendant is not a stranger to the criminal justice system, we decline to disturb the sentence (see People v Kilgore, 218 AD3d 1054, 1058 [3d Dept 2023], lv denied 40 NY3d 1081 [2023]; People v Quinn, 210 AD3d 1284, 1291 [3d Dept 2022], lv denied 39 NY3d 1079 [2023]).
Clark, J.P., Lynch, Reynolds Fitzgerald and Powers, JJ., concur.
ORDERED that the judgment is affirmed.